THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE WALKER, Defendant-Appellant.

First District (2nd Division)   No. 1—90—1489

Opinion filed September 7, 1993.

Ellis J. May III & Associates, of Chicago (Ellis J. May III, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Judy DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Following a jury trial, defendant George Walker was found guilty of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1)) and sentenced to an extended term of 60 years in the custody of the Department of Corrections, to be served consecutive to another 60-year sentence for an earlier conviction of aggravated criminal sexual assault. On appeal, he contends that (1) the circuit court erroneously denied his motion to quash his arrest and suppress evidence; (2) other crimes evidence was improperly admitted; (3) the court improperly denied his *pro se* motion to substitute counsel; (4) irrelevant evidence was admitted; (5) the evidence was not sufficient to prove him guilty beyond a reasonable doubt; (6) the State's closing argument prejudiced his right to a fair trial; and (7) his sentence was excessive.

At trial the following evidence was presented. K.A., the complainant, testified that on March 16, 1988, she was a high school senior. At approximately 8 p.m. on that day, she took the number 6 Jeffrey Avenue bus to her Aunt Esther's house, where she lived. She exited the bus at 90th and Jeffrey and began walking the "five short blocks" to her aunt's house at 90th and Crandon. As she reached the alley be-

tween Crandon and Luella Avenues, she heard footsteps behind her. When she turned, she saw a man jogging toward her wearing a "dark blue hooded sweat shirt, faded black jeans, and white converse gym shoes." As she stepped to the side so he could pass, "[h]e grabbed her from behind and put his hand around [her] mouth." She tried to scream, but could not. She started to hit him with her purse and the shopping bags that she was carrying, but he cut the straps with a "triangular-shaped" knife. He then picked her up, carried her through the alley to the back of the second house, turned her around, and began touching her face and hair. Although his hood was up, she was able to get a "clear view of his face" because the hood was a few inches above his hairline and because the alley was well lit. She saw that he had "very short" hair, a mustache that went around the corners of his mouth and had a space, a "flat and wide nose," and "big and full lips." She also noted that he was approximately 24 years old, four or five inches taller than her, and very muscular.

He told her to say that she loved him. When she began to scream, he told her to shut up and held the knife to her neck. After she told him that she loved him, he told her to "suck [his] dick." He then pushed her down to her knees by her shoulders while he continued to hold the knife to her neck. She undid his pants and pulled them down and he then "grabbed [her] hair from the back and pushed [her] mouth on his penis." He threatened to "cut" her if she bit his penis. After they heard a car drive by, he pushed her farther into the yard and told her to tell him that she loved him. He then told her to "touch her toes" and he pulled her dress up and her stockings down. After unsuccessfully attempting to insert his penis in her anus, he placed his penis in her vagina. Following vaginal intercourse, he "pulled [her] back to [her] feet, turned her around, and demanded oral sex again." He pushed her to her knees, but when he tried to push her face onto his penis, she "threw up" on him. She then heard a car, and when he stepped away, she ran to her aunt's house and told her aunt what happened.

After the police were notified, she was taken to South Chicago Hospital, where samples were taken from her mouth and vagina. While she was at the hospital, she spoke to Detective Sammy Lacey of the Chicago police department. She told him what happened and gave both a physical and clothing description of her assailant. She told him that the attacker weighed approximately 150 pounds and was approximately 5 feet 7 inches tall. However, when Lacey told her that he was 5 feet 7 inches, she said that the attacker was "four or five inches taller than that."

Two weeks later, on March 30, 1988, Lacey and a police sketch artist came to her house and she gave a description of her assailant while the artist drew a composite. Two days later, Lacey called her and told her to come to the police station. When she arrived, she was brought into a viewing room where she immediately identified defendant as her attacker from a lineup.

C.W. testified that on March 29, 1988, she left work at 5:40 p.m. and took the number 6 Jeffrey bus to her home at 90th and Constance. At about 6:30 p.m., she got off the bus at 91st and Jeffrey and began walking the three blocks to her house. As she reached the alley that runs behind Constance, she heard footsteps behind her. When she turned around, she observed defendant jogging toward her "wearing a blue hooded jacket, faded jeans, and white gym shoes." When she moved to the side to enable him to pass, he grabbed her from behind and put his left hand over her mouth and his right hand at her neck. She tried to scream, but could not. He said "shut up you stupid bitch" and held a knife to her neck. The knife was a dark gray, "box-cutter" knife with a triangular-shaped blade and the word "Stanley" imprinted on the side. He then pulled her down the alley toward her house, but he was unable to open the gate to the backyard. He then "spun" her around so that their faces were only one inch apart. She observed that he was in his early to mid-twenties, was about 5 feet 9 inches to 5 feet 11 inches tall, was very muscular, had a mustache that came down over the corners of his mouth and had a gap, and that he had a broad, flat nose, and thick lips.

Defendant then told her that he was "going to get *** some head" and pushed her down to her knees. He ordered her to drop her belongings and take off her coat and sweater. While holding the knife to her neck, he pulled off her bra and moved her head toward his crotch and "forced" his penis into her mouth. He started to laugh and asked her where she "learn[ed] to give head so good." He then pulled her back to her feet and brought her to the house across the alley from her own. As he reached over the gate to open it, she noticed that his hood had fallen down and she was able to see his uneven haircut, which was "very short" in some places. He opened the gate and pulled her across the lawn to a concrete patio.

He then said that he was "going to get *** some more head," pushed her back to her knees, and again "forced" his penis into her mouth. Defendant then removed his penis, told her to take off the rest of her clothes, and pushed her down to her hands and knees, causing her to scrape her knees on the concrete. After initially fondling her genitals, he "forced" his penis into her vagina, then into her

anus, and then again into her vagina. After unsuccessfully attempting anal intercourse a second time, defendant pushed her down and ran away. Though she was bleeding from her vagina, anus, and knees, she waited for a moment to make sure he was gone, before running to her house. When she reached her house, she started "pounding" on the back door until her mother opened it. When her mother asked what happened, she said that she had been raped. Her father then called the police. She was later taken to the hospital by ambulance.

Three days later, on April 1, 1988, she went to the police station with Detective Lacey to view a lineup of suspects. Upon entering the room, she immediately identified defendant. She also identified the knife that defendant used during the assault.

The parties then stipulated that if Dr. Susesh Shah were called to testify, he would state that he swabbed complainant's mouth and vagina at the South Chicago Hospital emergency room at 9:40 p.m. on March 16, 1988. The swabs were analyzed by Pamela Fish, a serologist for the Chicago police department, and were determined to be negative for spermatozoa.

Sergeant Sammy Lacey testified that on March 16, 1988, at approximately 9:30 p.m., he and his partner were assigned to investigate K.A.'s complaint and went to South Chicago Hospital in order to interview her. At the hospital, K.A. described her attacker's clothing and physical appearance, and the events that had occurred earlier that night.

Two weeks later, on March 30, 1988, he learned that another rape had occurred in the same area the day before. He then contacted C.W., who furnished him a physical and clothing description of her attacker. He also met with complainant again and had her describe the attacker to a sketch artist.

Around 7 p.m. the next evening, Lacey was driving west on 88th Street near Merrill, when he observed a black, two-door Cadillac travelling east on 89th swerve and pull up to the curb at 89th and Merrill. This location was approximately two blocks from where complainant was raped and four blocks from where C.W. was raped. Defendant got out of the car and walked up the stairs of a house. Lacey observed that he was black, 20 to 25 years old, and was wearing a blue hooded sweatshirt, dark faded jeans, and white gym shoes. He then pulled his car in front of the Cadillac, walked over to defendant, and identified himself as a police officer. When he asked defendant if he lived there, defendant responded that he was visiting a friend named Larry. Lacey then told defendant that he matched the description of a

suspect and asked to see some identification. Defendant said his ID was in the glove compartment and told Lacey he could get it.

Lacey opened the door to defendant's car and saw a box cutter knife and a jar of Vaseline. He then looked in the glove compartment and found another box cutter knife. He placed the three items on the roof of the car and then went to the door of the house in order to "check [defendant's] story." After speaking to the two people who answered the door at 8900 South Merrill, he told defendant that his story did not check out and placed him under arrest. He then brought defendant to the police station where he advised him of his *Miranda* rights and placed him in an interview room. At 9:20 p.m., C.W. came to the police station to view a lineup and immediately identified defendant as her attacker from a group of five men. Standard lineup procedures were then conducted for each participant, and C.W. again identified defendant. At 10:10 p.m., complainant came to the station, viewed a lineup, and identified defendant as the man who assaulted her. Lacey then contacted the State's Attorney's office.

At 11:15 p.m., Assistant State's Attorney Darren O'Brien spoke with defendant privately in an interview room. Approximately 30 minutes later, O'Brien asked Lacey to enter the interview room to serve as a witness to a written statement about complainant's assault. Defendant then signed the written statement, as did O'Brien and Lacey. Lacey left the room again but reentered it at 12:15 a.m., when he witnessed defendant sign a statement regarding C.W.'s attack.

Assistant State's Attorney Darren O'Brien testified that on April 1, 1988, at 9:40 p.m., he was called to the police station about a rape investigation. At the station, he met with Lacey, read some reports, and spoke to the complainant and C.W. At 11:15 p.m., he met with defendant in one of the interview rooms. He then told defendant that he was an attorney working with the police and advised him of his rights. Defendant stated that he understood who O'Brien was and that he understood his rights. After giving an oral statement about the incident of March 16, 1988, defendant agreed to give a written statement. O'Brien left the room to get the proper form and to tell Lacey to come back in the room. Defendant then repeated his statement while O'Brien recorded it on the form. When he was finished, O'Brien gave it to defendant to read and asked if he wanted to make any changes or corrections. After defendant stated that he did not want to make any changes, defendant, Lacey, and O'Brien each signed the form. O'Brien then asked Lacey to leave the room again and then spoke to defendant about the March 29, 1988, incident. When defendant indicated that he would give another written state-

ment, O'Brien asked Lacey to return. Defendant, Lacey, and O'Brien then signed the second statement.

O'Brien then read defendant's statements to the jury. In the first statement, defendant acknowledged that he was advised of his rights, and wished to give a summary of the events. He stated that on March 16, 1988, at approximately 9 p.m., he saw the complainant for the first time near 89th and Luella. He ran up behind her, grabbed her, and held a box cutter knife against her neck. He pulled her down the alley and ordered her to give him a "blow job." She fell to the ground and performed oral sex upon him until he ejaculated in her mouth. He then pulled her into a backyard, told her to remove her pantyhose and bend over, and then had sexual intercourse with her. He pulled his penis out of her vagina, and ordered her to give him another "blow job." Complainant then threw up and he ran away.

In the second statement, defendant waived his *Miranda* rights and then admitted that on March 29, 1988, at approximately 6:45 p.m., he ran up behind C.W. in the area of 90th and Bennett, held a retractable knife to her neck and dragged her down the alley. He ordered her to stop screaming, to remove her clothes, and to give him a "blow job." Defendant then brought her into another yard, told her to remove the rest of her clothes, and had vaginal intercourse with her. After demanding another "blowjob," he had anal intercourse with her, and then "one final blowjob."

Defendant testified in his own behalf that at the time of his arrest, he was on his way to a friend's house to have a fan belt put on his car. On his way to his friend's, he decided to stop at his acquaintance Larry's house in order to determine what they were going to do that evening. He did not know Larry's last name and had forgotten to bring Larry's address with him. Because he thought he remembered that Larry lived near 89th and Merrill, he drove around the area looking for his car. When he did not see Larry's car anywhere, he realized that some of the homes had garages and decided to ring the bell at the corner house to see if Larry lived there. After he was told that he had the wrong address, Lacey approached him and asked him his name and what he was doing in the area; he also told him that he matched the description of a wanted rape suspect. Lacey then searched his car and found two box cutter knives which he used at work as a shipping and receiving clerk, a jar of Vaseline which he needed to protect his lips and hands from chapping, and a blue hooded sweatshirt which he wore when he was on the loading dock at work. While Lacey searched the car, defendant was handcuffed by

two other officers who had pulled up. He was then taken to the police station and placed in an interview room.

Lacey interrogated him for approximately two hours. He asked Lacey approximately a "dozen" times if he could call his mother in order to get the number of the attorney who had represented him before. Lacey told him that there was no need to make a phone call because he would be able to leave if he was not identified in the lineup they were going to conduct. Later, Assistant State's Attorney O'Brien came into the room and began asking questions. Defendant reiterated that he knew nothing about the case, and then asked if he could make a phone call. O'Brien then left the room to get Lacey, who told him that he would not be allowed to make a phone call unless he cooperated. O'Brien then prepared a statement from the papers he had with him in the interview room. Defendant signed the statement because it was "the only way [he] felt that [he] could get some kind of contact with [his] family." He stated that O'Brien never read him his rights, and that he "blindly" signed the portion of the statement where his rights were written. He also stated that he was never given the statements to read; he was told to sign them, and O'Brien made "everything up."

Defendant also testified that on March 16, 1988, he was at his aunt's house eating dinner, and on March 29, 1988, he was doing laundry at a laundromat with his cousin. On cross-examination, however, he was unable to remember any other specific date on which he ate dinner at his aunt's house and said he went to the laundromat with his cousin on March 28 rather than the 29th.

In rebuttal, O'Brien testified that he advised defendant of his rights and that defendant never indicated to him that he wanted to make a phone call or speak with an attorney. Moreover, during the interview, he did not have any police reports in his presence, nor did he demand that defendant sign the statements.

As previously indicated, the jury found defendant guilty of aggravated criminal sexual assault. The circuit court then sentenced him to an extended term of 60 years to run consecutive to the 60-year term he had received for an earlier conviction for a similar offense. The State then nol-prossed five other indictments charging defendant with other sex offenses. This appeal followed.

## I

Defendant first contends that the circuit court improperly denied his motion to quash his arrest and suppress evidence because he was initially arrested without probable cause, the resulting search of his

car was illegal, and the statements were obtained in violation of his fifth amendment right to counsel. He asserts that the description Lacey relied upon was "general and indistinct" and therefore could not provide probable cause. He also maintains that the State's assertion that he consented to the search of his car is "incredible" and "contrived" because the police knew that no probable cause existed in the first place. Finally, he argues that the statements should have been suppressed because he repeatedly requested the opportunity to call his mother to get his attorney's phone number, but was told to wait while the police continued their questioning.

Prior to defendant's first trial, he moved to quash his arrest and suppress evidence. At the hearing on the motion, defendant gave substantially the same testimony he did at trial: he said that he was handcuffed before any search of his car occurred; that he did not consent to the search; that his repeated requests to call his mother fell on deaf ears; that O'Brien fabricated the statements and demanded that he sign them; and that he signed them only to have the opportunity to make a phone call.

Sergeant Lacey testified for the State that the composite sketch was based on descriptions provided by four alleged rape victims, including K.A. and C.W. All of the women described the attacker as wearing a blue sweatshirt or jogging suit with a hood and each encounter occurred in the evening in the same area. Three of the women described the attacker as a black man, between 20 and 25 years old, approximately six feet tall, with some facial hair. Based on these descriptions, a composite sketch was made of the suspect on March 30, 1988.

He further testified that on April 1, 1988, around 7 p.m., he was conducting a surveillance of the area when he noticed a black Cadillac "swiftly" pull over to the curb and stop near the corner of 89th and Merrill. He then saw defendant, who was wearing a blue hooded sweatshirt, faded jeans, and white gym shoes, exit the vehicle and walk up to a house. Defendant was a black man who appeared to be in his mid-twenties, approximately 5 feet 11 inches and 175 to 180 pounds. Because he felt that defendant matched the descriptions as well as the composite, he exited his car and approached him.

Lacey first asked defendant if he lived at that address and then told him that he matched the description of the suspect in a series of sexual assaults. Defendant gave a "little smile" and denied being the person for whom he was looking. When he asked for identification, defendant told him that it was in the glove compartment of his car and that he could get it himself. Another police car pulled up, and

Lacey asked the officers to "hang onto" defendant while he got the identification. When he opened the door to the car, he saw a box cutter knife and a jar of Vaseline resting on the front seat. He also found a smaller box cutter knife in the glove compartment. Lacey then told the officers to continue holding defendant while he checked defendant's story that he stopped at the house to visit a person named Larry. After learning that no one named Larry lived at that address, Lacey placed defendant under arrest and took him to the police station.

At the station, defendant was placed in an interview room and advised of his rights, which he stated that he understood. Lacey then told him that he would take part in a lineup, and he would be released if he was not identified. Defendant was told to remove his blue sweatshirt, leaving a red Coca-Cola shirt. After two lineups were held, defendant was returned to the interview room so that an assistant State's Attorney could speak with him. Lacey left the room, but was later called in to witness defendant's signature. At no time did defendant ever express to him a desire to call his mother so that he could contact his attorney.

Assistant State's Attorney O'Brien's testimony at the hearing was substantially similar to his trial testimony. Following arguments on the motion, the circuit court found that probable cause existed for the arrest, that the search of the car was consensual, and that defendant's statements were voluntarily given. The court stated that it believed Lacey regarding the encounter on the street, and that although a composite is "[n]ot a perfect device to describe anyone, *** it is in my opinion a close composite to the defendant." The court further stated:

> "Anyone seeing a person in that locale at that time of day with this set of clothes on, given the circumstance of the series of crimes, would have been most remiss in not approaching that person and stopping him as Officer Lacey did."

Furthermore, the court found that defendant consented to the search. Finally, the court stated that O'Brien was a believable witness and defendant was "utterly unbelievable" in his assertions that O'Brien fabricated the statements. The court therefore denied the motion.

Illinois law is well settled that a reviewing court will not disturb a circuit court's finding on a motion to suppress unless it is manifestly erroneous. (*People v. Gacho* (1988), 122 Ill. 2d 221, 234, 522 N.E.2d 1146, *cert. denied* (1988), 488 U.S. 910, 102 L. Ed. 2d 252, 109 S. Ct. 264; *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898.) It is the function of the circuit court in a hearing on a motion to suppress

to determine the credibility of the witnesses and to resolve any conflict in their testimony (*People v. Redd* (1990), 135 Ill. 2d 252, 289, 553 N.E.2d 316), and a reviewing court may not substitute its judgment as to the weight of disputed evidence or the credibility of the witnesses. (*People v. Johnson* (1986), 114 Ill. 2d 170, 190, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.) Moreover, while it is true that a police officer may not rely on a description which is general and lacking in distinctiveness to justify an arrest (*People v. Gabbard* (1979), 78 Ill. 2d 88, 93, 398 N.E.2d 574), a reviewing court will not question the circuit court's finding that the arrest was proper when it had the opportunity to compare personally the defendant to the composite in order to determine if similarities exist. *People v. Smith* (1991), 215 Ill. App. 3d 1029, 1037, 576 N.E.2d 186, *appeal denied* (1991), 141 Ill. 2d 556, 580 N.E.2d 130.

■ In the instant case, the circuit court expressly found that the State's witnesses were credible and defendant was not. Moreover, the court compared defendant to the composite and found that sufficient similarities existed. We agree with the circuit court that the officer "would have been most remiss" if he failed to ascertain defendant's identity and purpose in that area at that particular time of day. Accordingly, there is no reason for concluding that the circuit court's findings were manifestly erroneous.

## II

Defendant next contends that the circuit court erred in allowing the admission of C.W.'s testimony because the prejudicial effect of the evidence "far outweighed any possible probative value." He asserts that the "State primarily relied upon that evidence, not to prove [his] identity, but to establish that he possessed a propensity to commit crimes." He also contends that the evidence was unnecessary because complainant's own testimony provided a positive in-court identification. Furthermore, he maintains that the two crimes were not similar enough to constitute a *modus operandi* so as to earmark them as the actions of a single perpetrator. Instead, he asserts that the two crimes simply shared features which are common to crimes in general and cannot serve to identify him as the perpetrator of both. We disagree.

It is well settled that evidence of other crimes may not be admitted as proof of a defendant's propensity to commit crime. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 256, 547 N.E.2d 202, *cert. denied* (1990), 497 U.S. 1032, 111 L. Ed. 2d 804, 110 S. Ct. 3296.) Such evi-

dence may be introduced, however, if it proves a fact in issue, or if it shows *modus operandi*, identity, motive, or intent. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Whenever evidence of other crimes is offered, there must be some similarity between the other crime and the crime charged in order to ensure that it is not being used to establish the defendant's criminal propensity. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.) In order to prove *modus operandi*, "there must be a high degree of identity between the facts of the crime charged and the other offense." (*People v. Illgen* (1991), 145 Ill. 2d 353, 372-73, 583 N.E.2d 515.) Some dissimilarities may exist, however, without making the evidence inadmissible. (*People v. Phillips* (1989), 127 Ill. 2d 499, 520-21, 538 N.E.2d 500, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.) If they "share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant," the evidence will be admissible. (*People v. Connolly* (1989), 186 Ill. App. 3d 429, 434, 542 N.E.2d 517, *appeal denied* (1989), 128 Ill. 2d 666, 548 N.E.2d 1073.) Finally, any prejudice resulting from the admission of other crimes evidence will be substantially reduced by a proper limiting instruction. *Illgen*, 145 Ill. 2d at 376.

█ Here, in denying defendant's motion *in limine*, the court found that the two crimes were "strikingly similar" because both cases involved young black women, the same sexual acts, the same type of weapon, the same general location at similar times of day, nearly the exact same clothing description, and the same type of initial encounter with the attacker pretending to be a jogger, who then grabbed the women from behind. While we recognize that many sexual assaults involve such characteristics (see, *e.g., People v. Olesch* (1986), 143 Ill. App. 3d 577, 492 N.E.2d 1389 (16-year-old girl grabbed from behind and dragged at knifepoint through an alley to a yard where she was sexually assaulted)), the extent of the similarities between the two cases here is remarkable. In light of the physical and clothing descriptions, the localized area, the method of approach, and the specifics of the offenses, there can be little question that these separate crimes share enough "peculiar and distinctive features" so as to earmark both as the work of the same person.

Moreover, other crimes evidence was appropriate in this case because defendant consistently maintained that complainant's identification was insufficient to support his arrest, much less his conviction. "[W]hen the identification of the defendant is an issue, evidence of another crime which would bolster the identification is proper." (*Peo-*

*ple v. Bowman* (1992), 227 Ill. App. 3d 607, 613, 592 N.E.2d 240.) Finally, because the circuit court instructed the jury to consider the evidence only for purposes of identification, we must presume that the jury was able to follow the instructions and properly separate the issues. (*Illgen*, 145 Ill. 2d at 376.) Accordingly, we find no error in the admission of the evidence.

### III

Defendant next assigns error to the denial of his *pro se* motion to substitute counsel based upon his appointed counsel's previous student-teacher relationship with the mother of one of the State's witnesses.

Shortly before trial, defendant's attorney realized that C.W.'s mother had been his seventh-grade homeroom teacher and informed the court that a conflict of interest might exist. He stated that while it was "conceivable" that he and C.W. had met when they were children, it was unlikely that they would remember each other. The State then informed the court that C.W.'s mother, the former teacher, had been taken off the witness list for the instant case, and that although she testified in the earlier trial as an outcry witness, her testimony would not be presented in this case. Defense counsel then stated that he did not believe that his relationship with C.W.'s mother would interfere with his ability to represent defendant even if she were to remain on the witness list. The court then informed defendant of the situation, and defendant decided not to file a motion to substitute counsel at that time.

The next day, during jury selection, defendant brought a *pro se* motion to substitute counsel because C.W.'s "family played a key role in the prior trial," and he was unsure if his attorney could be effective if he knew the family. The court denied the motion, noting that the relationship with the daughter was too remote to disqualify the attorney's representation. Defendant then immediately filed a motion for substitution of judge. At a hearing held before another judge, defendant asserted that the trial judge was prejudiced against him because he had already been sentenced by him to a 60-year prison term. The other judge denied the motion, stating that a lengthy sentence is not grounds for a substitution of judge for cause. The next day, defendant brought another motion for substitution of judge, alleging that the trial judge was biased against him because he denied his motion to substitute counsel. After the assistant State's Attorney explained to the other judge the alleged conflict of interest, defense counsel stated that he had seen his former teacher only once since

1970. The other judge then denied the motion because defendant had already made one motion for a substitution of judge. Thereafter, the trial judge stated that he was "absolutely satisfied" that defendant would receive proper representation. Moreover, following defense counsel's cross-examination of C.W., the trial judge stated for the record that the examination was "fine and proper" and was as good as the "exceptional" cross-examination conducted by the private attorney who represented defendant in his first trial.

The right of a criminal defendant to effective assistance of counsel has long been recognized to include the right to the "undivided loyalty of counsel, free from conflicting interests or inconsistent obligations." (*People v. Flores* (1989), 128 Ill. 2d 66, 83, 538 N.E.2d 481, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 799, 110 S. Ct. 3291.) If a professional relationship or obligation results in a conflict of interest, the defendant need not show any prejudice in order to obtain a new trial. (*People v. Coslet* (1977), 67 Ill. 2d 127, 364 N.E.2d 67 (finding a *per se* conflict of interest where the attorney represented the defendant in a murder case while serving as the administrator of the decedent's estate).) In a case involving personal relationships, however, the defendant must demonstrate that he has been prejudiced in some way to establish reversible error. "Where personal relationships are at issue, [it] must [be] presume[d] that an attorney will not undertake to represent a defendant if his professional duty will be hampered by emotional ties." *People v. Davis* (1983), 97 Ill. 2d 1, 16, 452 N.E.2d 525 (finding no conflict of interest where defense counsel was acquainted with a person the defendant was accused of murdering).

■ Because defendant here asserts a conflict based on his attorney's personal rather than professional relationships, he bears the burden of establishing actual prejudice. What defendant has offered, however, is mere speculation as to potential problems. In contrast, defense counsel stated that he perceived no difficulties in his proceeding with the representation and the circuit court agreed. Furthermore, the court expressly stated that counsel's cross-examination of C.W. was more than adequate. Based upon those facts and our review of the record, we find no basis for concluding that defendant suffered any actual prejudice from his counsel's representation.

## IV

Defendant next contends that the circuit court erroneously allowed testimony about the discovery of the Vaseline jar in his car as well as the admission of the jar itself. He asserts that the evidence

was irrelevant to connect it "to this crime or any of the crimes [he] allegedly committed."

We note that defendant has waived this issue by failing to make a contemporaneous objection to the evidence at trial or to raise it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Furthermore, defendant's arguments fare no better under plain error analysis. The issue here is one of relevance, and the general rule is that physical evidence is relevant and may be admitted when there is proof connecting it with the defendant and the crime. (*People v. Free* (1983), 94 Ill. 2d 378, 415, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200.) Proof of the connection may be circumstantial. Evidence may be admitted if it is "suitable for the commission of the offense" regardless of whether the object actually was used in connection with the offense. (*People v. Givens* (1985), 135 Ill. App. 3d 810, 819, 482 N.E.2d 211.) Moreover, the admission of evidence is a matter within the sound discretion of the circuit court, and its ruling will not be disturbed on appeal absent an abuse of that discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696.

In the instant case, the State asserted that the Vaseline was suitable for the commission of the offense because it could have facilitated defendant's forceful intercourse. The circuit court did not abuse its discretion in admitting the evidence.

V

Defendant next contends that he was not proved guilty beyond a reasonable doubt. To support this contention, he maintains that if his motion to suppress were granted, the only evidence that would remain would be the complainant's identification, which he asserts is insufficient.

When the sufficiency of the evidence of guilt is challenged on appeal, the reviewing court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) In the instant case, the evidence was overwhelming. No evidence was presented that contradicted complainant's testimony that she was sexually assaulted; defendant's defense was that he was eating dinner at his aunt's house on that date. In light of the positive identifications both in court and

at the station, defendant's own statements, the corroborating evidence found in his car, and the composite which the circuit court stated matched defendant, defendant's guilt was proved beyond a reasonable doubt.

Moreover, although it is inappropriate to speculate about what evidence would exist if defendant were to have prevailed on a motion we have said was correctly decided against him, we note that our law is clear that a conviction may be sustained on the identification of a single witness provided the witness viewed the defendant under circumstances permitting a positive identification. (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317.) Here, the complainant's testimony alone would have been sufficient to convict defendant.

## VI

Defendant next contends that his right to a fair trial was prejudiced by the State's closing argument. A prosecutor is entitled to wide latitude when making a closing argument (see *People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970; *People v. Morrison* (1985), 137 Ill. App. 3d 171, 184, 484 N.E.2d 329), and the scope of permissible argument is within the sound discretion of the circuit court. (*People v. Lewis* (1990), 198 Ill. App. 3d 976, 982, 556 N.E.2d 697.) In order to constitute reversible error, the prosecutor's remarks must have caused substantial prejudice to the accused, such that the jury would have reached a different result if not for those remarks. (*People v. Morgan* (1986), 112 Ill. 2d 111, 132, 492 N.E.2d 1303, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329.) When assessing an alleged impropriety, a reviewing court must examine the closing arguments of both the State and the defendant in their entirety and the complained-of remarks in their proper context. *Cisewski*, 118 Ill. 2d at 175-76.

Defendant first takes issue with the prosecutor's comment linking the Vaseline to the offenses:

"[Lacey] finds the tools of [defendant]'s trade, and when I say the tools of [defendant]'s trade, I mean the tools of his trade as a rapist.

* * *

The Vaseline is sitting on the front seat of the car."

Despite defendant's protestations to the contrary, we believe the comments were proper remarks concerning the evidence. Although neither of the witnesses testified to defendant using Vaseline, we believe the prosecutor's comment was a reasonable inference from the evidence since the Vaseline was found in defendant's car with at least

one other object he allegedly used to commit the offense and it was suitable for the commission of the offense.

Defendant also takes issue with the following comment:

"[W]hy did he get up here and tell you that [K.A.] and [C.W.] lied? I'll tell you how he did that.

Do you remember when he testified yesterday about the lineup procedure? He told you that when he was placed in that lineup, that when [K.A.] and [C.W.] saw the lineup; he was forced to wear this. He was forced to wear this sweat shirt [sic] and, obviously, the reason for saying that is so they would pick him out so he would stand out like a sore thumb.

You will see the lineup photos. You will see there is no blue-hooded sweat shirt [sic] in the lineup photos. They both tell you they saw him wearing the red Coca-Cola shirt. They never saw him in any blue-hooded sweat-shirt in the lineup.

Why is he trying to make them out as liars? He's trying to make them out as liars to get out from under this case."

■ A prosecutor may state that a defendant is lying if that opinion is based on the evidence. (*People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.) Such is the case here. Both complainant and C.W. testified that defendant was wearing the red Coca-Cola shirt during the lineup, not the blue sweatshirt defendant stated he was told to wear. Therefore, it was proper for the prosecutor to indicate to the jury that there was contradictory testimony and to provide a motive for defendant to lie. Accordingly, we find no merit to defendant's contention.

## VII

Defendant last contends that his sentence is excessive. He asserts that the offense was not committed in a brutal and heinous manner. The State responds that defendant has waived this issue by failing to file a motion to reduce sentence. We agree. See *People v. Gomez* (1993), 247 Ill. App. 3d 68.

■ Furthermore, even if we were to reach the merits of defendant's contention, his arguments would be unavailing. A circuit court's imposition of a sentence is a matter of judicial discretion and will not be deemed excessive on appeal absent an abuse of that discretion. (*People v. Younger* (1986), 112 Ill. 2d 422, 494 N.E.2d 145.) In the instant case, the court stated that it considered defendant to be a "deviate and evil person who enjoys hurting women and making them suffer" and that the facts indicated a "brutal, vicious, and depraved

rape." However, despite these statements, the court did not impose an extended-term sentence due to "brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2).) Instead, the court expressly stated that it was sentencing defendant under subsection (b)(1), authorizing the imposition of an extended-term if a defendant is convicted separately of two or more similar class felonies within 10 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1).) Thus, because defendant was convicted of aggravated criminal sexual assault one year earlier, he was eligible for an extended-term sentence in this case. Accordingly, we find no abuse of discretion here.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.