NOTICE

Decision filed 04/18/06. The text of
this decision may be changed or
corrected prior to the filing of a
Petition for Rehearing or the
disposition of the same.

NO. 5-03-0744

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
                                      ) Circuit Court of
      Plaintiff-Appellee, ) St. Clair County.
                                        )
v. ) No. 02-CF-513
                                        )
FERNANDEZ URSERY, ) Honorable
                                        ) Robert J. Hillebrand,
      Defendant-Appellant. ) Judge, presiding.
_____

JUSTICE HOPKINS delivered the opinion of the court:

Following a jury trial, the defendant, Fernandez Ursery, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2002)) and was sentenced to 50 years in prison. On appeal, the defendant argues that he was denied a fair trial and the effective assistance of counsel. We affirm.

FACTS

On May 19, 2002, at approximately 4:30 a.m., Tynette Carpenter heard gunshots outside her home. When the police arrived, Tynette walked outside and saw her 48-year-old brother, Henry Carpenter, on the ground. Edward "Mickey" Watson, a neighbor, approached Tynette and consoled her.

Kevin Barnes, who lived a few houses from the murder scene, testified that on May 19, 2002, at approximately 4:50 a.m., he woke to a commotion coming from the direction of the Carpenter home. The commotion was followed by a scream and eight or nine rapidly fired gunshots. Barnes testified that there was no pause after the first two shots and that he saw repeated flashes from the gun. After the shooting stopped, Barnes stayed on the floor of

1

his home for a while.

After the police arrived, Barnes went outside and saw Henry on the ground. While waiting for an ambulance to arrive, Courtney Carpenter (Henry's brother) and Daren Carpenter (Courtney's nephew) arrived. Courtney told Barnes that on his way to the scene, he had seen a neighbor, Ernestine Wade, drop a bag in the trash at a gas station on 26th Street. Wade lived close to the Carpenter home along with her daughter, Renita Denzmore, Watson (Denzmore's boyfriend), and Denzmore's children. Barnes testified that Courtney thought it was odd that Wade had dropped a bag in the trash at the gas station because Courtney knew that Wade and her family burned their trash in a barrel. Barnes told Courtney that he should retrieve the bag. Courtney and Daren left the scene and retrieved the bag from the trash.

Within a few minutes, Courtney returned to the scene with the bag and gave it to Gregory Jonas, a Centreville police sergeant. Jonas took possession of the bag and gave it to the crime scene investigator. The bag contained blue jeans, a denim jacket, tee shirts, a pair of white-and-black Nike tennis shoes, and a gun.

Barnes testified that at 3 p.m., another neighbor, Linda Jackson, told him that a suspicious-looking man was peeping out from behind the window blinds at 456 South 39th Street. Barnes told Courtney about the man, and Courtney called the police.

Courtney's and Daren's testimonies closely mirrored Barnes' testimony.

Denzmore testified that on the day of the shooting, she lived at 456 South 39th Street with Wade, Watson, and her children. On the day of the shooting, Denzmore went to bed at 12:30 a.m. At that time, Watson told her that he had "something to do." Denzmore testified that she later awakened and saw police lights outside her home. At that time, Watson was in bed with her. Denzmore and Watson went outside and saw Henry on the ground. Later in the afternoon, a police officer asked Denzmore if she had given the defendant permission to

2

be in her home, and she answered in the negative.

Wade testified that on the evening before Henry's murder, she was babysitting Denzmore's children while Denzmore, Watson, and another couple were out together. Denzmore and Watson returned home at approximately 12:30 a.m. Denzmore went directly to bed. About 30 minutes later, Watson went into Wade's bedroom, which was located in the basement, and gave her a white grocery bag. Watson told Wade that the defendant would arrive about 3 a.m. to get the bag. Watson went upstairs, and Wade heard his footsteps as he went into the bedroom to go to bed.

At 4 a.m., Wade went outside because she was unable to sleep. She saw Henry sitting in a car at the end of the driveway. Henry asked Wade if she was okay, and he drove away after she told him that she could not sleep. Approximately five minutes later, Wade walked to Denzmore's vehicle to retrieve a cigarette. Wade saw Henry return with the defendant in the front passenger seat. Henry parked in front of Wade's house. Wade then saw Henry drive in front of his mother's home, which was one house north of Wade's home. Wade went back inside her home and into the basement, where she sat on the side of the bed and smoked a cigarette.

Wade heard several gunshots in a row with no pause between them. Approximately one minute later, the defendant appeared inside Wade's bedroom. The defendant undressed and placed his clothing in the white bag that Watson had given Wade earlier in the evening. Wade testified that the defendant smelled like liquor. Wade claimed that she did not know the defendant very well and that she went upstairs because he made her feel uncomfortable. Watson and the defendant each gave Wade $10 to buy cigarettes, and the defendant told Wade to throw the white bag into a trash bin on 25th Street. Before she left, Wade noticed that the defendant poured alcohol into an ashtray, which was located in her bedroom, and he burned something that smelled like rubber. The police later recovered a burnt latex glove

3

from Wade's basement. When the defendant finished, he turned off the light, got into Wade's bed, and told Wade to tell the police that he was her company. Wade testified that she was not romantically involved with the defendant.

Wade drove Watson's vehicle to the corner of 26th and Bond Streets and threw the bag into a trash bin. The next day, Wade was arrested. Wade testified that after she was released on bond, she discovered that her home had been ransacked by the police and she had no place to go. Wade went to Colorado to live with her sister and stayed there for 16 days before her arrest and return to Illinois. Wade claimed that she could not return to Illinois on her own because she had no money. In exchange for Wade's testimony at the defendant's trial, the police agreed to dismiss her obstruction-of-justice charge.

Gregory Musgrave, a captain for the Centreville police department, testified that he arrived at the hospital at 5:45 a.m. and found that although Henry was undergoing emergency treatment, he was "lucid and alert." Musgrave testified that he knew Henry "fairly well" and that when Henry saw Musgrave, he called him "Greg." Henry also recognized Steve Brown, a sergeant for the Centreville police department, and called him "Brown." Musgrave testified that Henry was in "very serious condition" and experiencing "extreme pain." Henry told Brown and Musgrave that "Watson's friend from Washington Park" had shot him. Henry died at the hospital.

The same day, Brown learned that the defendant fit the description of "Watson's friend from Washington Park." Brown was also informed that a suspicious man was peeping out of a window at 456 South 39th Street in Centreville, Illinois. At approximately 3:50 p.m., several Illinois State Police officers, Alorton officers, and a Caseyville officer accompanied Musgrave and Brown to 456 South 39th Street. They entered the house with the consent of the owners, Wade and Denzmore. The officers found the defendant in the house and arrested him.

4

The defendant waived his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) and provided the police with a written statement. The statement was read to the jury. The defendant claimed that on the night of the shooting, he, Watson, Henry, and Wade were outside Watson's house "getting drunk." Watson accused Henry of being a paid informant, which caused an argument between them, and Henry "jumped" the defendant. The defendant claimed that he shot Henry twice, dropped the gun, and ran away. As he ran, the defendant heard more shots fired. The defendant also stated that on the night of the shooting, he wore blue jogging pants, white Nike tennis shoes, a white tee shirt, and a black jacket.

Suzanne Bolen, an Illinois State Police latent fingerprint examiner, testified that the gun and latex gloves lacked sufficient fingerprint impressions to conduct fingerprint analysis. Although two fingerprint impressions were discernible on the white bag, they did not match Henry's, Wade's, or the defendant's fingerprint impressions.

Brian Hapack, an Illinois State Police forensic biologist, testified that he examined the tennis shoes, tee shirt, sweatpants, and jacket retrieved from the white bag and examined the contents for the presence of blood and found none. Hapack also found a clear plastic glove in the pocket of the jacket. Hapack tested the glove and did not find any blood. Hapack also tested the gloves found in Wade's basement and found no blood.

Michael Grist, an Illinois State Police crime scene investigator, identified eight 9-millimeter shell casings and two fired projectiles from the crime scene. Grist testified that Courtney had given Sergeant Jonas the bag which contained clothing and a gun and that Jonas had given them to Grist.

Thomas Gamboe, an Illinois State Police forensic scientist, identified the gun retrieved by Courtney as a 9-millimeter semiautomatic pistol. Gamboe examined eight 9-millimeter fired cartridge cases (People's exhibits 2 through 8) and the bullets retrieved from the victim's

5

autopsy (People's exhibits 20 and 21) and determined that they had been fired from the recovered 9-millimeter handgun (People's exhibit 14).

Raj Nanduri, a forensic pathologist, testified that he performed Henry's autopsy and found that he had been shot nine times at close range. Nanduri explained that Henry had died from a gunshot wound to the abdomen.

On May 21, 2002, the State filed a criminal information charging the defendant with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2002)) and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2002)).

On June 22, 2002, Shawn Pruitt was incarcerated in the St. Clair County jail due to misdemeanor traffic offenses, and he shared a cell with the defendant. Pruitt testified that he had known the defendant for approximately 10 years and was "friendly" with him. Pruitt testified that the defendant bragged about shooting Henry in the chest and that the defendant told him that he did so because Henry had stolen drugs while cleaning out a car. The defendant told Pruitt that he had worn gloves during the shooting so no fingerprints would be found on the weapon. When the defendant bragged about the shooting, he was unaware that Henry was Pruitt's "close friend."

Pruitt acknowledged that on June 24, 2002, he gave a written statement to the police about the defendant's confession.

On August 26, 2002, the State filed a criminal information charging the defendant with first-degree murder (720 ILCS 5/9-1(a)(1) (West 2002)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2002)), and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2002)).

Benjamin Koch, an Illinois State Police officer, testified that in October of 2002, Wade gave a fourth statement to police. In that statement, she told officers, for the first time, about the defendant burning latex or rubber gloves in the basement of her home immediately

6

after Henry's murder. On November 1, 2002, at approximately 4:30 p.m., Koch, along with Sergeant Brown and another officer, entered the basement of Wade's former residence. While inside the basement, the officers found two latex gloves, one cloth jersey glove, and a burned latex glove in an ashtray. Koch admitted that the house was in an "extreme state of disarray" and that he did not know how long it had been abandoned.

After hearing the evidence, the jury found the defendant guilty of first-degree murder. The defendant filed a timely notice of appeal.

ANALYSIS

Initially, the defendant claims that he was denied his right to a fair trial because the circuit court allowed into evidence gloves that were found in an unsecured house approximately six months after the murder. Additionally, the defendant claims that the State failed to establish a sufficient connection between the gloves, the defendant, and the crime. We disagree.

It is within the circuit court's discretion to decide whether evidence is relevant and admissible. *People v. Nunn*, 357 Ill. App. 3d 625, 630 (2005). A circuit court's decision concerning whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001). An abuse of discretion will be found only where the circuit court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the circuit court's view. *Morgan*, 197 Ill. 2d at 455. Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence. *Morgan*, 197 Ill. 2d at 455-56. However, a circuit court may reject evidence on the grounds of relevancy if the evidence is remote, uncertain, or speculative. *Morgan*, 197 Ill. 2d at 456.

The general rule is that physical evidence may be admitted provided there is proof

7

to connect it with the defendant and the crime. *People v. Coleman*, 222 Ill. App. 3d 614, 624 (1991). "Proof of the connection may be circumstantial. Evidence may be admitted if it is 'suitable for the commission of the offense' regardless of whether the object actually was used in connection with the offense." *People v. Walker*, 253 Ill. App. 3d 93, 108 (1993) (quoting *People v. Givens*, 135 Ill. App. 3d 810, 819 (1985)). Evidence may be inadmissible, however, if it has little probative value due to its remoteness, its uncertainty, or its possibly unfair prejudicial nature. *People v. Enis*, 139 Ill. 2d 264, 281 (1990).

In the instant case, the gloves were admissible and relevant, and the State established a sufficient circumstantial connection between the gloves, the defendant, and the crime. Wade's testimony demonstrated that the defendant entered her bedroom immediately after the shooting and burned latex gloves in an ashtray. After Wade gave her fourth statement to the police in October of 2002, they found the gloves in her bedroom. Additionally, Pruitt told the police that the defendant bragged that he had worn gloves during the shooting so no fingerprints would be found on the weapon. Moreover, the jacket found in the bag with the murder weapon contained a clear plastic glove in the jacket pocket. The clothes in the bag were identical to the ones the defendant admitted wearing on the night of the shooting. Although we recognize that a jury could find that the discovery of gloves six months after a crime in a house that was in extreme disarray and had been abandoned since the shooting had little probative weight in determining the defendant's guilt, it did not affect the admissibility of the gloves. See *People v. Garcia*, 7 Ill. App. 3d 742, 747 (1972) (gloves found two weeks after a burglary in bushes where the defendant had been hiding and two blocks from the burglarized premises were admissible and relevant since sufficient circumstantial evidence connected them with the defendant). For these reasons, there was a sufficient nexus between the gloves, the defendant, and the murder. Hence, the circuit court did not abuse its discretion in admitting the gloves into evidence.

Next, the defendant argues that the introduction of a prior consistent statement by Pruitt, a State witness, was plain error and that trial counsel was ineffective for failing to object. We disagree.

In general, pretrial statements used to corroborate trial testimony are inadmissible. *People v. Heard*, 187 Ill. 2d 36, 70 (1999). An exception to this rule applies when it is suggested that the witness recently fabricated the testimony or had a motive to testify falsely and the prior statement was made before the motive to fabricate arose. *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005).

Initially, we note that Pruitt's one-word affirmation acknowledging that he told the police what the defendant had told him merely stated the obvious–that Pruitt had previously made a statement to the police. The substance of the prior statement was not admitted into evidence. See *People v. Williams*, 264 Ill. App. 3d 278, 289 (1993) (a prior-consistent-statement issue was waived because, *inter alia*, witnesses had not testified to the substance of the prior statements). Even if we were to consider Pruitt's one-word affirmation as a prior consistent statement, the admission of the statement was not error. In defense counsel's opening statement, he claimed that the circumstances surrounding Pruitt's statement showed that it was not credible. By making this statement, defense counsel suggested that Pruitt had fabricated his testimony or had a motive to testify falsely. The State responded to this remark by asking Pruitt on direct examination if he had given a statement to the police wherein Pruitt told the police what the defendant had told Pruitt. Pruitt replied, "Yes." On cross-examination, defense counsel's questions suggested that Pruitt's testimony was not credible because the State had quashed five warrants that had been out for his arrest immediately prior to his testimony and, in turn, Pruitt did not have to post $600 for bail. In other words, defense counsel suggested that the State saved Pruitt $600 for his showing up and testifying in this case. The circuit court did not err by admitting Pruitt's one-word affirmation

9

acknowledging that he had given a statement to the police *before* the five warrants for his arrest were quashed. Because the testimony was admissible under the exception to the general bar on such statements (see *Cuadrado*, 214 Ill. 2d at 91), the admission was not error.

Additionally, we note that the defendant claims that the State has not addressed this issue on appeal and that therefore the State has conceded that it improperly used Pruitt's prior consistent statement. However, in its brief, the State argues that its elicitation of the fact that Pruitt spoke to the police on June 22, 2002, and told them what the defendant had told him was not error. The State then goes on to point out that Pruitt claimed that the defendant had worn gloves during the shooting so there would be no fingerprints. At the time of Pruitt's statement, the latex glove had not been found in the jacket that was in the bag with the murder weapon. Also, Wade had not told the police about the gloves that the defendant had brought to her bedroom. The State argues: "[T]he timing of Pruitt's statement–before there was any other evidence of the use of gloves in the shooting–is as important as the fact that defendant said he wore gloves, since it establishes that Pruitt told the same story before there was any reason to fabricate. For this reason, the prosecutor asked defendant if he had provided the information to the police on June 24, 2002." The State then argues: "It is axiomatic that prior consistent statements are admissible to show that a witness told the same story before a motive came into existence or before the time of an alleged fabrication. [Citation.] Accordingly, the prosecutor's question and Pruitt's response was [*sic*] not an improper prior consistent statement."

For this reason, the State did not concede that it improperly used a prior consistent statement as evidence.

Because the State did not improperly use a prior consistent statement as evidence, the defendant's trial counsel was not ineffective for failing to object or raise the issue in a posttrial motion.

Due to our disposition of the foregoing issue, we need not address the ineffective-assistance-of-counsel claim that is related to this issue.

Finally, the defendant argues that his trial counsel was ineffective for failing to invoke his speedy-trial rights for the murder charge. Specifically, the defendant claims that section 3-3 of the Illinois Criminal Code of 1961 (Criminal Code) (720 ILCS 5/3-3 (West 2002)), the compulsory-joinder provision (see *People v. Williams*, 204 Ill. 2d 191, 198 (2003)), required the State to charge the defendant with murder on May 21, 2002, when he was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2002)) and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2002)), rather than waiting to file that charge on August 26, 2002. The defendant argues that the State violated his right to a speedy trial because it failed to prosecute within the appropriate number of days and that his trial counsel was ineffective for failing to seek his discharge. We disagree.

"An attorney's failure to seek discharge of his client on speedy-trial grounds generally will be deemed ineffective assistance of counsel if there is a reasonable probability that the defendant would have been discharged had a timely motion for discharge been made and no justification has been proffered for the attorney's failure to bring such a motion." *People v. Staten*, 159 Ill. 2d 419, 431 (1994). The likelihood of success of a motion to discharge must be addressed before a court analyzes whether counsel was justified in declining to move for a speedy trial. *People v. Boyd*, No. 2-03-1358 (March 16, 2006).

The rule for determining the number of speedy-trial days attributable to the State when new and additional charges are brought against a previously charged defendant was initially stated in *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981):

> "Where new and additional charges arise from the same facts as did the original charges and the State *had knowledge of these facts at the commencement of the prosecution*, the time within which trial is to begin on the new and additional

11

charges is subject to the same statutory limitation that is applied to the original charges. Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained." (Emphasis added.)

In *Williams*, 204 Ill. 2d at 203-04, the Illinois Supreme Court reiterated its approval of the rule but stated that it applies only to new and additional charges *that are subject to compulsory joinder* pursuant to section 3-3 of the Criminal Code (720 ILCS 5/3-3 (West 1996)). The *Williams* court determined that the speedy-trial statute should not be interpreted to require a joinder that was not already mandated by section 3-3 of the Criminal Code. *Williams*, 204 Ill. 2d at 203. The *Williams* court stated:

"If the initial and subsequent charges filed against the defendant are subject to compulsory joinder, delays attributable to the defendant on the initial charges are not attributable to the defendant on the subsequent charges." *Williams*, 204 Ill. 2d at 207.

In the case at hand, the speedy-trial period for the original charges will also apply to the murder charge only if the murder charge is subject to compulsory joinder. Section 3-3 of the Criminal Code (720 ILCS 5/3-3 (West 2002)) provides:

"(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.

(b) If the several offenses *are known to the proper prosecuting officer at the time of commencing the prosecution* and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c), if they are based on the same act.

(c) When 2 or more offenses are charged as required by Subsection (b), the court in the interest of justice may order that one or more of such charges shall be

12

tried separately." (Emphasis added.)

In the instant case, on May 19, 2002, the defendant was arrested, and on May 21, 2002, he was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2002)) and aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2002)). On May 19, 2002, the defendant claimed that he had shot a gun in the victim's direction in self-defense and that he had heard another person fire the gun several times as he ran from the scene. Hence, on May 21, 2002, the State did not know all the facts surrounding the murder. Although the State might have suspected that the defendant had planned to kill Henry, it was not until the defendant bragged to Pruitt in June of 2002 that the State's evidence indicated that the defendant committed murder. Because the murder offense was not "known to the proper prosecuting officer at the time of commencing the prosecution" (720 ILCS 5/3-3(b) (West 2002)), it was not subject to compulsory joinder, and the defendant's right to a speedy trial on the murder count was not violated.

Due to our disposition of the foregoing issue, we need not address the defendant's remaining arguments regarding the speedy-trial issue.

### CONCLUSION

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.


Affirmed.


SPOMER, P.J., and CHAPMAN, J., concur.


13