# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Luciano*, 2013 IL App (2d) 110792

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL A. LUCIANO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0792 |
| Filed | March 14, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The mandatory natural-life-without-parole sentence imposed on defendant, who was a juvenile when the offenses were committed, for 2007 murder charges was vacated as invalid pursuant to the retroactive application of *Miller*, and the dismissal at the first-stage review of his postconviction petition alleging that his counsel were ineffective in handling the contention that the 2007 murder charges were subject to compulsory joinder with other charges brought in 1991 against defendant based on the same incident was reversed, since a factual issue existed as to whether the State had sufficient knowledge to prosecute defendant for the murder in 1991. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 07-CF-1753; the Hon. M. Karen Simpson, Judge, presiding. |
| Judgment | Judgment reversed and sentence vacated; cause remanded with directions. |

| | |
|---|---|
| Counsel on Appeal | Alan D. Goldberg and Jonathan Yeasting, both of State Appellate Defender's Office, of Chicago, for appellant. |
| | Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer, Jay Paul Hoffman, and Mary Beth Burns, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices Hutchinson and Schostok concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, Michael A. Luciano, appeals the judgment of the circuit court of Kane County, summarily dismissing his postconviction petition. Defendant questions the propriety of his mandatory natural-life-without-parole sentence in light of recent Supreme Court authority and urges that his counsel was ineffective for failing to move to dismiss his 2007 murder charges because they were based on the same acts as charges to which, in 1991, he pleaded guilty. We reverse, vacate defendant's sentence, and remand the cause with directions.

¶ 2                              I. BACKGROUND

¶ 3    In *People v. Luciano*, No. 2-09-0066 (2010) (unpublished order under Supreme Court Rule 23) (*Luciano I*), we set forth in detail the factual background of this case, and we do not need to repeat it. Instead, we summarize the salient facts for purposes of the issues raised in this appeal.

¶ 4                              A. The Offense

¶ 5    On Halloween night, 1990, Albert "Psycho" Gonzalez, then-president of the Insane Deuces, a street gang in Aurora, was shot to death at his home on Grove Street in Aurora. Suspicion for the shooting fell on the Latin Kings, another gang in Aurora, and specifically on defendant; his father, Angel Luciano, who was the leader (Inca) of the Latin Kings in Aurora; and Robert "Droopy" Rangel. In 1990 and 1991, defendant was charged with solicitation to commit aggravated discharge of a firearm and illegal possession of weapons, some of which were used in the Gonzalez shooting. Rangel went to trial for the murder while the charges against defendant pended. Rangel was acquitted of the murder. After Rangel's acquittal, the State entered into a plea agreement with defendant in which defendant would plead guilty to possessing certain firearms, including those used in the Gonzalez shooting, in exchange for the State nol-prossing the charge of solicitation to commit aggravated discharge.

-2-

¶ 6   In about 2005, the case was revived when members of the Aurora Latin Kings were being arrested and charged with violating federal drug laws. To avoid heavier sentences, some gang members agreed to cooperate with the authorities, including the Kane County State's Attorney. In 2007, both defendant and Angel Luciano were charged with the murder of Gonzalez on the theory that they ordered fellow Latin Kings to carry out the shooting. Angel Luciano was acquitted of the Gonzalez murder charges while defendant was convicted of intentional murder and "strong probability" murder as well as felony murder predicated on mob action.

¶ 7   The conviction of the Gonzalez murder was defendant's second conviction of murder. Some months before the trial in this matter, defendant was convicted of the 1989 murder of Willie Arce. When this case advanced to sentencing, defendant, having been convicted of two murders, was deemed subject to a mandatory sentence of natural life without parole, notwithstanding the fact that he was 17 years old at the time of the offenses. Defendant directly appealed his conviction in this case, arguing only that, because the same evidence was presented against Angel Luciano during their simultaneous trial, and Angel Luciano was acquitted, the evidence was insufficient to support defendant's conviction. We held that the evidence was sufficient to convict defendant because the trial court carefully segregated and considered the evidence pertaining to each defendant. Because some evidence was admitted against defendant and not against his father, *i.e.*, the evidence pertaining to each defendant was not identical, the evidence against defendant supported his conviction. See *Luciano I*, No. 2-09-0066 (Oct. 26, 2010) (unpublished order under Supreme Court Rule 23).

¶ 8   Subsequently, defendant filed a *pro se* postconviction petition. In the postconviction petition, defendant raised, among other things, an ineffective-assistance claim, contending that the 2007 murder charges were subject to compulsory joinder with the 1991 solicitation-to-commit-aggravated-discharge and gun-possession charges, so trial counsel was ineffective for failing to move to dismiss the 2007 charges, and appellate counsel was ineffective for failing to raise trial counsel's ineffective assistance. The trial court summarily dismissed the petition.

¶ 9                                B. The Trial

¶ 10   We next give a brief overview of the trial. As earlier noted, on Halloween night of 1990, Gonzalez was shot to death at his home. A police investigation revealed that the shooters stood on a grassy area about 190 feet from the house and shot through its walls. Gonzalez was struck in the chest and died from a bullet wound to his heart. Scant comfort though it may be, at the time of the shooting, Gonzalez's wife and children were out of the house trick-or-treating. The police investigation of the grassy area uncovered shells and shell casings of various calibers and types, including rifle and shotgun ammunition.

¶ 11   On November 4, 1990, the police searched a residence on Galena Boulevard in Aurora, recovering a number of weapons and ammunition. Photographs of Angel Luciano with others making gang signs, Latin Kings records, solvent, and rubber gloves were also recovered. Searches of other structures on the property, namely, a trailer and a panel van, uncovered more ammunition, photographs, and a newspaper clipping about the Gonzalez murder.

¶ 12    On November 7, 1990, the police searched an apartment on Best Place in Aurora following an interview with Hector "Winehead" Rodriguez. Hector Rodriguez had told police about an October 31, 1990, meeting at which weapons were distributed to Latin Kings members, including Rangel, Jose "Bam Bam" Martinez, and Jose "Speedy" Rivera, with orders to use them to shoot Gonzalez. Hector Rodriguez had also told police that, on November 3, 1990, the weapons were returned to defendant at the Best Place apartment.

¶ 13    Police executed the search warrant late that night. Inside the bedroom, police recovered weapons that were later determined to be consistent with the evidence discovered at the grassy area across from Gonzalez's house. In particular, they found a sawed-off "Ted Williams" 12-gauge shotgun, a Commando Mark .45-caliber assault rifle with 27 bullets still in its magazine, a .30-caliber carbine, and a Marlin .30-30 rifle. In addition, assorted ammunition of various calibers was recovered. Testing matched evidence from the grassy area to the Ted Williams shotgun, the Marlin .30-30 rifle, and the Commando Mark .45 assault rifle. Additionally, defendant's fingerprints were found on the Commando Mark .45 assault rifle.

¶ 14    Juan Acevedo spoke to police and revealed that three Latin Kings–Rangel, Michael "Loco" Rodriguez, and Jose Delatorre–visited his house after the shooting. Acevedo related that the three used an outside water spigot to wash their hands, and then they left. The police searched Michael Rodriguez's home, recovering a loaded .22-caliber gun.

¶ 15    Late in 1990, the Kane County State's Attorney began prosecuting cases arising from the Gonzalez shooting. Rangel was charged with Gonzalez's murder; defendant was charged with a number of gun possession offenses and, in May 1991, the charge of solicitation to commit aggravated discharge of a firearm was added. While defendant's charges were pending, Rangel went to trial on the murder charge. At the trial, Hector Rodriguez and Acevedo testified. Rangel was acquitted. Following the acquittal, in December 1991, defendant pleaded guilty to possessing the Ted Williams shotgun, the Marlin .30-30 rifle, and the Commando Mark .45 assault rifle, in exchange for the State's agreement to nol-pros the charge of solicitation to commit aggravated discharge of a firearm. We note that, at defendant's trial for the murder of Gonzalez, his guilty pleas were entered into evidence to demonstrate that he possessed the weapons that were used in the Gonzalez shooting.

¶ 16    The Gonzalez murder investigation languished for about 15 years. Federal efforts into investigating the Aurora Latin Kings began to turn members and former members into cooperating witnesses. In 2007, defendant was charged with the murder of Gonzalez. At the trial, several witnesses who were active in the Aurora Latin Kings around the time of the Gonzalez shooting testified for the State.

¶ 17    Michael Rodriguez testified about a meeting, held in the basement of Angel Luciano's house on Galena Boulevard, that occurred before Halloween. According to Michael Rodriguez, the same members who would later attend the Halloween meeting were present. Michael Rodriguez testified that Angel Luciano told the attending members that Halloween presented the gang with a good opportunity to wear black (one of the gang's colors) and do shootings. Michael Rodriguez also testified about the Halloween night meeting, which took place at the house of Angel Luciano's girlfriend. Attending the meeting were Angel Luciano,

defendant, Hector Rodriguez, Rivera, Jose "Fang" Hernandez, Juan "Orco" Corral, Jose Oliva, and "Joe." A number of rifles were piled on a table and defendant told the membership to go out and shoot up rival gangs. Michael Rodriguez testified that defendant passed a shotgun to Rangel, a .30-30 to "Joe," and the .45-caliber assault rifle to Hector Rodriguez. Michael Rodriguez testified that he did not receive a weapon from defendant and asserted that Irving Childress did not receive a weapon from defendant, either. Michael Rodriguez testified that Angel Luciano ordered him, Rangel, Joe, and Childress to "hit" Gonzalez. Due to a recent injury, Childress was excused and he gave Michael Rodriguez his weapon. Angel Luciano also instructed the group to go to a park near the Gonzalez house and shoot from there.

¶ 18 Michael Rodriguez described how he, Rangel, and Joe went to the grassy area and shot at Gonzalez's house. He testified that he used a .22-caliber rifle and, after the shooting, dropped it in the grassy area as they ran back to Joe's car. The three then went to Acevedo's house. Joe and Rangel dropped off the other weapons there and they all washed their hands.

¶ 19 Michael Rodriguez also testified about the plea deal he had entered into with the State. He revealed that, in exchange for his testimony and pleading guilty to conspiracy to commit murder, he received a seven-year sentence. The sentence was reduced to five years after he had testified in another homicide case.

¶ 20 Hector Rodriguez testified that defendant ordered him to shoot Gonzalez and gave him the Commando Mark .45-caliber assault rifle to use in that task. Hector Rodriguez testified that there had been a Latin Kings meeting during the afternoon of Halloween, and he thought it occurred in the basement of Diane's house (Diane was a girlfriend of Angel Luciano). Rangel and defendant were among the gang members who attended the meeting. It was at this meeting when defendant ordered Hector Rodriguez to perform the shooting.

¶ 21 Hector Rodriguez testified that he drove with Rivera to Gonzalez's home to do a drive-by shooting, with the assault rifle. As he was driving by the Gonzalez home, he observed police and other emergency vehicles already at the scene, so he drove off. Later, defendant told him to "move" the assault rifle, so he returned the weapon to defendant at Diane's house (but this location was, according to Hector Rodriguez, not the same place where the Halloween-afternoon meeting occurred). Hector Rodriguez testified that he placed the assault rifle on a bed with other weapons, including the Ted Williams shotgun and the Marlin rifle, while defendant was busy wiping down all of the weapons.

¶ 22 Hector Rodriguez also testified that, a couple of nights before Halloween, he went to the Attic, a bar located in downtown Aurora. There, he encountered other Latin Kings gang members, including defendant and Angel Luciano. At the Attic, Angel Luciano instructed him to perform a drive-by shooting at Gonzalez's house.

¶ 23 Hector Rodriguez also acknowledged that he had testified for the State during Rangel's October 1991 murder trial. In his testimony in the Rangel trial, he had asserted that the Halloween-day meeting occurred in a house on Plain Avenue. In the present trial, Hector Rodriguez asserted that he had dropped out of the Latin Kings gang and was not receiving any consideration for his testimony. He acknowledged, however, that he understood that the Kane County State's Attorney's office would send a letter indicating his cooperation in this

matter to the Wisconsin prosecutor who had convicted him of a sex offense, for which he was serving a five-year term of incarceration. In addition, the record shows that, despite his claim that he was not receiving consideration for testifying in the Rangel trial, drug charges against him had been withdrawn after his testimony at that trial.

¶ 24 Oliva testified about a gang meeting on Halloween day in 1990. Oliva testified that defendant was present, along with Rangel, Martinez, and others (but could not recall if Michael Rodriguez was present). Oliva testified that between 15 and 30 guns were spread out on a table. The members were told to take guns and use them against other gangs; they took guns and left in groups. Oliva testified that he was instructed to hit Gonzalez. He observed Rangel take a sawed-off shotgun and Martinez take a .30-30 rifle. Oliva testified that he spent the night driving around with a couple of girls and, a couple of hours after the offense, he learned that Gonzalez had been shot.

¶ 25 Oliva noted that, on November 4, 1990, he was first questioned by the police. During police questioning, Oliva gave police a mixture of true information and lies. Oliva acknowledged that, during a 2006 federal trial, he admitted that he had provided false testimony in the past. Oliva also acknowledged that, in exchange for his testimony against defendant, he had been given favorable sentencing terms when he was facing a possible natural-life term arising from drug convictions. Oliva acknowledged that he could be released from prison in as little as 15 months if the federal authorities believed that he was cooperating.

¶ 26 Hernandez testified about a gang meeting that he believed was held on Halloween. According to Hernandez, Angel Luciano ran the meeting and defendant was present, but he could not recall who else attended. Hernandez testified that Angel Luciano told those present to get a gun and shoot members of the Insane Deuces during the night. Hernandez testified that some of those present already had guns; guns were given to those who did not already have them, but Hernandez was unable to recall who distributed the guns.

¶ 27 Hernandez testified that, later that night, he went to Acevedo's house. Rangel, Michael Rodriguez, and Martinez drove up and Hernandez saw that they had a shotgun and a .30-30 rifle in the car. The three drove away, and, shortly after, he heard some gunshots from the direction of Gonzalez's house.

¶ 28 Hernandez acknowledged that he had been given a good deal in exchange for a guilty plea. In exchange for his plea and his testimony at trials, Hernandez's sentence was significantly reduced.

¶ 29 In addition to the gang members, the State presented the testimony of Detective Langston of the Aurora police. Langston testified as an expert witness about street gangs. Langston testified that, in October 1990, Angel Luciano was the leader of the Latin Kings and defendant was a member, as were a number of other witnesses. Gonzalez was a member of the Insane Deuces, and the Latin Kings and the Insane Deuces were at war at that time. Langston opined that the Gonzalez shooting was gang-related. Langston also revealed that he had been shot by a Latin Kings gang member and that he did not like the Latin Kings, but he denied that he held any personal animosity toward defendant or Angel Luciano.

¶ 30 Defendant called Acevedo to testify on his behalf. Acevedo testified that, on Halloween

-6-

1990, he had been recently released from prison and was subject to electronic monitoring and could not go more than 150 feet from his house. On that night, he did not violate the terms of his release. Acevedo testified that Hernandez came to his house in the evening, then left and did not return that evening. Later, a car carrying Rangel, Delatorre, Michael Rodriguez, and Childress stopped by. The four men got out of the car and washed up at a spigot on the side of his house, and then they left. All of the men had guns, which they left in the back of Acevedo's house.

¶ 31    In November 1990, Acevedo talked with the police. Acevedo told police that only three men had visited his house on Halloween; he did not mention Childress. Further, Acevedo told police that the men were not armed. Acevedo explained that, when talking to the police in November 1990, he did not want to mention that he was around guns or that there were guns at his house, because of the terms of his release. Acevedo testified at Rangel's 1991 murder trial. At the Rangel trial, Acevedo stated that he did not see Rangel on Halloween 1990. Acevedo now admitted that he had lied in Rangel's trial, and he noted that he was convicted of perjury for that testimony, receiving and serving a five-year sentence.

¶ 32    Acevedo testified that, on Halloween 1990, he figured out that Gonzalez had been shot. He recounted that he heard gunshots and observed the police driving toward the Gonzalez house shortly after the four Latin Kings left his house.

¶ 33    In April 2003, he first mentioned Childress's involvement in the Gonzalez shooting, when he was being interviewed by federal authorities. He also mentioned the weapons he saw that night, although he admitted that he was not able to identify them on his own, but learned what they were from Childress.

¶ 34    The trial court carefully analyzed the evidence and carefully divided it between evidence pertaining only to defendant and evidence pertaining only to Angel Luciano. The trial court concluded that the evidence was not sufficient to convict Angel Luciano and acquitted him; contrarily, the trial court concluded that the evidence was sufficient to convict defendant and found him guilty.

¶ 35    The case then moved to the sentencing phase. A few months before defendant's trial for the Gonzalez shooting, he had been convicted of murdering Willie Arce. As a result, the sentencing hearing in this case was very brief because the parties recognized that Illinois sentencing law at the time mandated a sentence of natural life without parole. The trial court expressed dislike for the mandatory natural-life term but acknowledged the need to follow the statute and imposed a sentence of natural life without parole, notwithstanding that, at the time of the Gonzalez shooting, defendant was 17 years of age.

¶ 36                    C. Posttrial Proceedings

¶ 37    On direct appeal, defendant challenged only the sufficiency of the evidence. Defendant questioned how the same evidence could be both insufficient to convict his father and sufficient to convict him. We noted that the evidence pertaining to Angel Luciano differed from that pertaining to defendant and determined that, in fact, the evidence against defendant was stronger than that against Angel Luciano and was sufficient to support defendant's conviction. See generally *Luciano I*, No. 2-09-0066 (Oct. 26, 2010) (unpublished order under

Supreme Court Rule 23).

¶ 38   On May 31, 2011, defendant filed his postconviction petition. In the petition, defendant raised a number of issues that were not addressed in the direct appeal, including whether the State violated a federal judicial order requiring the State to keep certain witnesses separated while in jail waiting to testify in this case, and whether defendant's trial counsel was ineffective for failing to move to dismiss the murder charges, based on double jeopardy principles. Defendant argued that the murder charges were based on the same acts on which the gun-possession and solicitation-to-commit-aggravated-discharge charges were based, triggering the State's obligation for the compulsory joinder of the charges in 1991. Defendant contended that, because the State had not joined the murder charges with the gun-possession and solicitation charges, his subsequent murder trial was untimely. Defendant additionally contended that his appellate counsel was ineffective for failing to raise the ineffectiveness and double jeopardy issues on appeal.

¶ 39   The trial court disagreed. It held that defendant failed to show that the State knew in 1991, for purposes of compulsory joinder, of the facts underlying the murder prosecution. Accordingly, on July 25, 2011, the trial court summarily dismissed defendant's postconviction petition. Defendant timely appeals.

¶ 40                                    II. ANALYSIS

¶ 41   On appeal, defendant raises two arguments. First, defendant contends that, in light of *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), which held that a statutory scheme that imposed a mandatory natural-life sentence on a minor violated the eighth amendment's prohibition against cruel and unusual punishment, his mandatory life sentence imposed for his conviction of a second murder committed when he was 17 years of age also violates the eighth amendment. Second, defendant argues that his trial counsel was ineffective for failing to move to dismiss the murder charges raised against him in 2007, because the murder charges were based on the same acts as the 1991 gun-possession and solicitation-to-commit-aggravated-discharge (which was nol-prossed) charges, which acts were known to the State in 1991, thus violating compulsory-joinder and speedy-trial provisions. We consider each argument in turn.

¶ 42                                    A. Sentencing

¶ 43   Defendant first challenges the propriety of imposing a natural-life sentence upon a minor in light of *Miller*, which rendered mandatory life sentences for minors unconstitutional. We review *de novo* a challenge to the constitutionality of a statutory provision. *People v. Hollins*, 2012 IL 112754, ¶ 13.

¶ 44   As a preliminary matter, during the pendency of this appeal, defendant filed three motions to cite additional authority, namely, *People v. Williams*, 2012 IL App (1st) 111145, *People v. Morfin*, 2012 IL App (1st) 103568, and again *People v. Williams*, 2012 IL App (1st) 111145, as modified December 12, 2012. We deny defendant's first motion as moot (in light of the fact that the court modified the opinion on December 12, 2012) and grant defendant's remaining two motions. We now turn to defendant's claim that *Miller* should

retroactively invalidate his mandatory natural life sentence.

¶ 45     The State argues that defendant's *Miller* argument should fail for three reasons. First, defendant has forfeited the argument altogether. Second, *Miller* is not retroactively applicable to defendant's sentence in this postconviction posture. Third and last, the sentencing provision is not unconstitutional under the proportionate penalties clause of the Illinois Constitution. We consider the State's claims in turn.

¶ 46     The first hurdle for defendant is the claim of forfeiture. The State contends that defendant asserted the unconstitutionality of his sentence neither in his direct appeal nor in his postconviction petition, thereby forfeiting his claim. The State notes that, because postconviction proceedings are designed to allow inquiry into issues that were not and could not have been decided on direct appeal, issues that were presented and decided on direct appeal are barred by *res judicata*, and issues that could have been presented on direct appeal, but were not, are forfeited. *People v. Tate*, 2012 IL 112214, ¶ 8. Defendant counters that his sentence was void and could be challenged at any time. See *People v. Brown*, 225 Ill. 2d 188, 203 (2007) (a sentence that is statutorily unauthorized or violates the constitution is void and subject to challenge at any time). It is also well established that "any time" includes for the first time in the appeal of a dismissal of a postconviction petition. *People v. Thompson*, 209 Ill. 2d 19, 25-27 (2004).

¶ 47     The State contends that defendant's counterargument, that the mandatory life sentencing provision (Ill. Rev. Stat. 1989, ch. 38, ¶ 1005-8-1(a)(1)(c) (now 730 ILCS 5/5-8-1-(a)(1)(c)(i) (West 2010))) is void *ab initio*, is incorrect because the statute is not facially unconstitutional. See *People v. Jackson*, 199 Ill. 2d 286, 300 (2002) (only a facially unconstitutional statute (one for which there is no set of circumstances under which it would be valid) is void *ab initio*). The State argues that, because *Miller* did not proscribe life-without-parole sentences for juveniles, only *mandatory* life without parole, and because mandatory life-without-parole sentences may be imposed on nonjuveniles, there exist circumstances under which the sentencing provision is valid. The State concludes that, because the sentencing provision is not facially unconstitutional, it is not void *ab initio*, and because defendant did not properly raise his challenge at trial, on direct appeal, or in his postconviction petition, he has forfeited this contention. We disagree.

¶ 48     While the State accurately cites authority to support its reasoning, its argument is far too narrow. Defendant does in fact contend that the statute is void *ab initio*, but he also contends simply that his sentence is void because it violates the Constitution pursuant to the reasoning of *Miller*. While it is true that a statutory provision that is void *ab initio* may be challenged at any time (*People v. Wright*, 194 Ill. 2d 1, 23-24 (2000)), it is also true that a sentence that contravenes the Constitution may be challenged at any time (*People v. Strawbridge*, 404 Ill. App. 3d 460, 470 (2010)). Because defendant's argument is a proper voidness challenge to his sentence, we may consider it. *Id.* ("[a]s [the] defendant's contention is that his sentence [is void], we will review it").

¶ 49     Next, defendant must establish the retroactive applicability of the *Miller* decision to this case. To do that, defendant must first show that *Miller* would apply to the provisions at issue in this case.

¶ 50     In *Miller*, the United States Supreme Court held that the United States Constitution prohibits a mandatory natural-life sentence for juvenile offenders. At the time of the offense in this case, the Illinois sentencing scheme contained several provisions that acted together to impose a natural-life-without-parole sentence on defendant. Section 5-4 required offenders accused of murder and older than 15 years to be tried and sentenced as adults. Ill. Rev. Stat. 1989, ch. 37, ¶ 805-4. The same provision also generally permitted offenders of 17 years to be sentenced as adults. *Id.* Under the sentencing provision most directly at issue, "the court shall sentence the defendant to a term of natural life imprisonment *** if the defendant has previously been convicted of first degree murder." Ill. Rev. Stat. 1989, ch. 38, ¶ 1005-8-1(a)(1)(c) (now 730 ILCS 5/5-8-1(a)(1)(c)(i) (West 2010)). That provision consistently has been interpreted to require the imposition of a natural-life sentence on anyone convicted of more than one murder, regardless of the offender's age. *People v. Amigon*, 239 Ill. 2d 71, 84 (2010); *People v. Taylor*, 102 Ill. 2d 201, 206 (1984). Further, at the time of the offense, any natural-life sentence was a sentence without the possibility of parole. Ill. Rev. Stat. 1989, ch. 38, ¶ 1003-3-3(d) ("[n]o person serving a term of natural life imprisonment may be paroled or released except through executive clemency" (now 730 ILCS 5/3-3-3 (West 2010))). These provisions, then, constituted the type of sentencing scheme determined to be unconstitutional in *Miller*. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

¶ 51     Next, we consider the issue of retroactive application. Generally, a new constitutional rule will not be applied retroactively to a case on collateral review. *People v. Sanders*, 238 Ill. 2d 391, 401 (2010). The rationale for this general rule recognizes the State's legitimate interest in the finality of criminal convictions. *Id.* However, exceptions exist: in *Teague v. Lane*, 489 U.S. 288, 301 (1989), the United States Supreme Court determined that a new constitutional rule will retroactively apply (1) if the new rule placed certain kinds of primary, private individual conduct beyond the power of the criminal-law-making authority to proscribe, or (2) if the new rule required the observance of procedures that are implicit in the concept of ordered liberty. *Sanders*, 238 Ill. 2d at 401.

¶ 52     Explaining further, with the first exception, the Court was speaking to substantive, as opposed to procedural, rules, and it included within the exception rules not only placing particular conduct or persons beyond the State's power to punish, but also limiting the penalty to be applied to a certain defendant. *Schriro v. Summerlin*, 542 U. S. 348, 352 (2004). In contrast, the second exception is concerned with procedural rules only and, particularly, only those procedural rules that can be deemed "watershed rules of criminal procedure" and that affect the likely accuracy of a conviction. (Internal quotation marks omitted.) *Sanders*, 238 Ill. 2d at 401. A sentencing issue, which has no involvement in the accuracy of the conviction, then, is outside of the second *Teague* exception. *People v. Morris*, 236 Ill. 2d 345, 363 (2010).

¶ 53     The State argues that neither of the *Teague* exceptions applies to this case. The State first emphasizes that *Miller* prescribed only the procedure to be followed in sentencing a juvenile defendant and did not ban altogether the imposition of natural-life sentences on juveniles. Further, the State relies on *People v. Davis*, 388 Ill. App. 3d 869 (2009), in which the appellate court held that our supreme court's decision in *People v. Miller*, 202 Ill. 2d 328 (2002) (hereinafter *Leon Miller*), would not be applied retroactively. We consider *Davis* in

detail.

¶ 54    In *Leon Miller*, the defendant was convicted under a theory of accountability of two murders in which his participation was relatively minimal and passive, as a lookout. *Id.* at 331. Our supreme court held that the mandatory life sentence imposed on the defendant was unconstitutional as applied to the defendant, violating the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). *Leon Miller*, 202 Ill. 2d at 341, 343. The supreme court further explained that, while a life sentence could be appropriate for a juvenile offender convicted under a theory of accountability, the sentence in that case was improper because it failed to account for the defendant's level of involvement. *Id.* at 341-42.

¶ 55    In *Davis*, 388 Ill. App. 3d at 871, the appellate court considered whether *Leon Miller* should be applied retroactively to the defendant. The defendant was convicted of two 1990 murders for which he received a mandatory life sentence. The defendant participated in the planning and execution of the offenses, but the evidence showed that he did not actually shoot any of the victims. *Id.* at 873-74. The defendant filed several successive postconviction petitions, all of which were dismissed. He then filed a petition seeking relief from judgment on the theory that *Leon Miller* rendered his sentence, *i.e.*, a mandatory life sentence for a juvenile convicted of two murders, albeit under a theory of accountability, unconstitutional, and this petition was ultimately dismissed. *Id.* at 876-77. The *Davis* court conducted the *Teague* analysis and held that *Leon Miller* did not create a new substantive rule and thus did not apply retroactively to the defendant. *Id.* at 882.

¶ 56    The State appears to rely on *Davis* for two main reasons. First, as an example of a proper *Teague* analysis. Second, as a demonstration that *Miller* did not announce a substantive rule of law. The State points to the *Davis* court's determination that *Leon Miller* did not announce a new substantive rule because *Leon Miller* did not prohibit the imposition of natural-life sentences for all juveniles convicted under a theory of accountability. See *id.* at 881. The State appears to reason that, similar to the Illinois Supreme Court's holding in *Leon Miller*, the United States Supreme Court in *Miller* did not announce a new substantive rule because it acknowledged that sentences of natural life could be appropriate for some juveniles (*Miller*, 567 U.S. at ___, 132 S. Ct. at 2469), leading to the conclusion that *Miller* does not warrant retroactive application in this case (see *Davis*, 388 Ill. App. 3d at 882 (holding that *Leon Miller* did not announce a new substantive rule and did not otherwise warrant retroactive application)). We disagree.

¶ 57    Recently, in *Morfin*, 2012 IL App (1st) 103568, the First District determined that *Miller* should be applied retroactively to a case on collateral review. The court reasoned that *Miller* announced a substantive rule by requiring for every minor convicted of first-degree murder a sentencing hearing at which a sentence other than natural life must be made available for consideration. *Id.* ¶ 56. In other words, because *Miller* required the court to consider a sentencing range broader than that provided by statute for minors convicted of first-degree murder, it was not a procedural rule, but a substantive rule. *Id.* The fact that the potential sentence of natural life was not categorically eliminated by *Miller* did not matter, because the sentencing range for minors convicted of first-degree murder had been broadened categorically. *Id.* In so reasoning, the *Morfin* court distinguished recent foreign authority that had declined to apply *Miller* retroactively. *Id.*; see *Geter v. State*, No. 3D12-1736, 2012 WL

4448860, at *5 (Fla. Dist. Ct. App. Sept. 27, 2012) (holding that *Miller* was not substantive, but only procedural); *Gonzalez v. State*, 101 So. 3d 886 (Fla. Dist. Ct. App. 2012) (following *Geter*); *People v. Carp*, No. 307758, 2012 WL 5846553 (Mich. Ct. App. Nov. 15, 2012) (same). (We note that the State also cites to *Geter*, arguing that the weight of authority, both Illinois and foreign, runs in support of its position that *Miller* should not be applied retroactively.) We find *Morfin* to be persuasive. We agree that, while *Miller* can be read to announce a procedural rule, namely, the requirement that youth-related mitigation be considered in any sentencing hearing in which a minor would otherwise be subject to a mandatory natural-life sentence, there is a valid and substantive distinction between the pre-*Miller* sentencing regime and the *Miller*-mandated broadened range of sentencing options that courts are to consider. Accordingly, we accept and choose to follow the holding in *Morfin* and agree that *Miller*'s rule is better understood to be a substantive rule and not a solely procedural rule. *Morfin*, 2012 IL App (1st) 103568, ¶ 56.

¶ 58 Further supporting our determination, we note that *Davis* is distinguishable. First, *Davis* was decided well before the United States Supreme Court announced its decision in *Miller*. The *Davis* court did not have the benefit of the *Miller* decision in determining whether *Leon Miller* was to be applied retroactively and thus the constitutional landscape was completely different at the time *Davis* was decided. Second, *Davis* was factually distinguishable from *Leon Miller* to the extent that the *Leon Miller* holding would not have been applicable even on direct appeal. As we noted above, *Leon Miller* involved a 15-year-old defendant who acted only as a lookout (*Leon Miller*, 202 Ill. 2d at 331) and who was "the least culpable offender imaginable" (*id.* at 341). In *Davis*, by contrast, the defendant was involved in the planning and execution of the offenses, and it was only by fortuity that he was unable to shoot at the victims. *Davis*, 388 Ill. App. 3d at 873-74. In *Davis*, then, the defendant was perhaps only accountable for his codefendants' actions, but he also planned and actively participated in the offenses; *Leon Miller* specifically distinguished the type of defendant in *Davis*: "It is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate." *Leon Miller*, 202 Ill. 2d at 341. The factual situation in *Davis* presents exactly the type of juvenile offender for whom a sentence of life without parole could be appropriate, as contemplated in *Leon Miller*.

¶ 59 Last, there is a substantive change wrought by *Miller*, which is illustrated effectively by considering the sentencing standards to be employed after *Leon Miller* and *Miller*. *Leon Miller* made the punishment of a juvenile offender convicted of two murders a matter of the trial court's discretion, so that the defendant would be sentenced to natural life without parole unless he would be able to make out a case that such a punishment would be constitutionally invalid as applied to him under his particular circumstances. *Miller*, by contrast, requires in every case with a minor defendant a full sentencing hearing with a range of sentences available to the court, even in a situation that would otherwise qualify the offender for a mandatory life sentence without parole. Stated differently, mitigation faces an uphill battle in a case in which the *Leon Miller* holding is applied, but mitigation is on an equal footing with other considerations in a case in which the *Miller* holding is applied. See

*Morfin*, 2012 IL App (1st) 103568, ¶ 58. Thus, we find *Davis* and its reasoning to be distinguishable from the case at bar.

¶ 60    The State also argues that *Miller* is outside of the second *Teague* exception because it does not announce a watershed rule of criminal procedure, such as *Gideon v. Wainwright*, 372 U.S. 335 (1963). The State also contends that the second *Teague* exception is extremely narrow, citing a number of Supreme Court cases that rejected retroactive application of new rules. We note that a different panel of the First District Appellate Court determined that *Miller* in fact stated a watershed rule of criminal procedure sufficient to qualify under the second *Teague* exception. *Williams*, 2012 IL App (1st) 111145, ¶¶ 52-53 (modified December 12, 2012). Nevertheless, because of our determination to follow *Morfin*, we need not further evaluate the merits of the State's arguments regarding the second *Teague* exception. We express no opinion on *Williams* and whether we would follow it or distinguish it.

¶ 61    We next turn to the State's third and final contention on this point, that the sentencing provision is not unconstitutional under Illinois's constitution. We have determined that *Miller* is retroactively applicable to this case, implicitly finding the sentencing provision to be in violation of the United States Constitution. We need not further address the State's argument regarding whether the sentencing provision passes muster under the Illinois Constitution, because the finding of a violation of the United States Constitution would trump any determination under the Illinois Constitution. *People v. Mata*, 217 Ill. 2d 535, 546-47 (2005).

¶ 62    Our determination that *Miller* applies retroactively to this case raises the issue of the relief to which defendant is entitled. Our holding means that the sentencing scheme under which defendant was sentenced is unconstitutional. *Miller* held that a "mandatory" life sentence was unconstitutional where a juvenile offender was to be sentenced. Thus, because defendant here was sentenced to a mandatory term of natural life without parole, his sentence is invalid and we vacate it. We find that defendant is entitled to a new sentencing hearing at which the trial court may consider all permissible sentences and is not limited to the sentence of life without parole. See *People v. Hauschild*, 226 Ill. 2d 63, 88-89 (2007) (proper remedy when a sentencing provision is held to be unconstitutional is to allow resentencing in accordance with the statute absent the invalid provision).

¶ 63    Defendant argues that, on resentencing (actually, because we have vacated his sentence, it would be more properly termed a "sentencing" rather than a "resentencing," but we will persist in using the term "resentencing" to denote that this will be a second and new sentencing hearing), he should be subject to only the 20- to 60-year range for murder. See Ill. Rev. Stat. 1989, ch. 38, ¶ 1005-8-1(a)(1)(a). We disagree. *Miller* did not invalidate the penalty of natural life without parole for a second murder conviction, only its mandatory character as applied to a minor defendant. Thus, the penalty is still on the table even though, as *Miller* states, its imposition should be uncommon because it will be the "rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Miller*, 567 U.S. at ___, 136 S. Ct. at 2469. Accordingly, upon resentencing, we direct the trial court to consider all permissible sentences consistent with our decision here.

¶ 64                                    B. Ineffective Assistance

¶ 65        Defendant next contends that the trial court erred in dismissing his postconviction petition, because he alleged the gist of a claim of ineffective assistance of both trial and appellate counsel. Specifically, defendant argues that both trial and appellate counsel were ineffective because trial counsel did not file a motion to dismiss the 2007 murder charges due to a violation of the compulsory-joinder provisions of the Criminal Code of 1961 (720 ILCS 5/3-3 (West 2006)) and appellate counsel did not raise the issue. With regard to joinder, defendant argues that the 2007 murder prosecution was based on the same facts as the 1991 charges of gun possession and solicitation to commit aggravated discharge of a firearm. Defendant specifically argues that the State had sufficient knowledge at the time of the 1991 prosecution to also prosecute him for the Gonzalez murder. Defendant further reasons that, because the State waited, the speedy-trial period lapsed and a motion to dismiss the 2007 prosecution would have been reasonably likely to succeed. Notwithstanding defendant's substantive arguments, defendant also contends that, given the relatively relaxed pleading requirements for a first-stage postconviction petition, the trial court erred in holding that his petition was frivolous and patently without merit and dismissing it at the first stage.

¶ 66        Defendant's arguments present something of an analytical onion, consisting of layers that must be peeled back individually to reach the next layer. In our view, it makes the most sense to tackle defendant's "onion" from the inside out, dealing with the substance of his claims first. We do this in the knowledge that the parties and the reader are aware, at least generally, of the standards of review that pertain to a postconviction petition and a claim of ineffective assistance, which we shall deal with later. It seems unduly cumbersome to recite those standards in a vague and general way, when, if we proceed in an inside-out fashion, the standards and the parties' contentions pertaining to ineffective-assistance and postconviction-petition claims will have a clear context.

¶ 67        Accordingly, we begin with defendant's claim that the State possessed knowledge sufficient to allow it to initiate the murder prosecution at the same time it was prosecuting defendant for gun possession and solicitation to commit aggravated discharge of a firearm. Defendant points to the State's general theory in the 2007 murder charges and at trial, namely, that he passed out guns to gang members and instructed them to shoot Gonzalez. Defendant notes that, during his sentencing for the gun-possession charges, this theory was presented by the State through the testimony of Officer Reichardt and used as evidence in aggravation. Defendant attached to the postconviction petition a copy of excerpts from the transcript of Reichardt's testimony. In addition, defendant attached to his postconviction petition[1] copies of a police report outlining this theory. According to defendant, the State's

---

[1]We note that defendant submitted a postconviction petition and a memorandum in support of the postconviction petition, both with attached exhibits. Defendant suggests that the trial court ignored the memorandum, because it appears to have ignored the exhibits attached to the memorandum. We deem that the petition and the memorandum, plus the exhibits attached to each, constitute defendant's postconviction petition for purposes of our analysis and this decision.

knowledge was sufficient in 1991 to allow the State to proceed with a murder prosecution at that time.

¶ 68     The State disagrees. The State argues that the evidence cited by defendant served only to make the State suspect that defendant might have been involved in the Gonzalez murder. In other words, rather than having knowledge of it, the State only suspected defendant's involvement, and it did not have sufficient evidence to proceed with a murder prosecution. The State further points to defendant's acknowledgment that, after the unsuccessful Rangel prosecution, the investigation into the Gonzalez murder stalled until 2005, when gang members from the time of the shooting began to cooperate with authorities. According to the State, it was not until this time that the cooperating witnesses finally provided it with sufficient evidence to transform its suspicion into knowledge for purposes of section 3-3 of the Criminal Code and to allow it to proceed with the murder prosecution against defendant.

¶ 69     The issue presented here turns on "knowledge" under section 3-3 of the Criminal Code. The State generally correctly presents and explains the rules of law to be followed. Ultimately, however, the State's argument does not succeed in applying the identified rules to the circumstances here. We also note that defendant asserts that the State's argument fails because the State does not focus on defendant's postconviction petition, but on the record as a whole. According to defendant, when properly considered in the context of a first-stage postconviction submission, defendant adequately alleged the gist of a constitutional deprivation sufficient to allow the matter to proceed to the second stage. We first consider the requirements of the compulsory-joinder provision.

¶ 70     The compulsory-joinder provision states: "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution ***." 720 ILCS 5/3-3(b) (West 2006). This provision has been interpreted to mean that, where there are new and additional charges, if they arise from the same facts as the original charges and the State had knowledge of these facts at the commencement of the prosecution, then the new and additional charges must be brought to trial within the same limitations period that applies to the original charges. *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981) (hereinafter *Ronald Williams*). Further, regarding the new and additional charges, the defendant will not be charged with any delays or continuances that apply to the original charges, because to do so would allow the State to circumvent the protections of the compulsory-joinder and speedy-trial provisions in the Criminal Code and the Code of Criminal Procedure of 1963. *Id.* at 249. While this rule has been eroded somewhat over time (see *People v. Gooden*, 296 Ill. App. 3d 205, 210 (1998), *aff'd in part & rev'd in part*, 189 Ill. 2d 209 (2000) (declining to follow *Ronald Williams* because there was no indication that the State was trying to circumvent the protections offered by the compulsory-joinder and speedy-trial provisions or to hinder the defendant's defense while at the same time trying to prevent the defendant from benefitting from the continuances on the original charges while the speedy-trial term was counting down on the new charges)), our supreme court has steadfastly upheld the *Ronald Williams* rule (see *Gooden*, 189 Ill. 2d at 222 (delay occasioned by the State in filing the new and additional charges would not be attributable to the defendant)).

¶ 71     For example, in *People v. Williams*, 204 Ill. 2d 191, 207 (2003), our supreme court held

-15-

that, "[i]f the initial and subsequent charges filed against the defendant are subject to compulsory joinder, delays attributable to the defendant on the initial charges are not attributable to the defendant on the subsequent charges." The court reiterated that the rule is designed to prevent the State from ambushing the defendant with the additional (and perhaps more serious) charges at the last minute even though it was able to prepare them during the pendency of the original charges, so that the defendant would face an unpalatable choice between enforcing his speedy-trial rights and giving them up in his need to prepare for trial on the new charges. *Id.* This consistent interpretation of the relationship between speedy-trial rights and the compulsory joinder provision is of relatively little import here where the lapse of time between the original charges and the additional charges is years rather than days, but it does illustrate the principle that the defendant will not be charged with the State's delay in raising the additional charges, so that, if the additional charges are made outside of the speedy-trial limitations period for the original charges, the matter will not go forward.

¶ 72 Turning from the interplay between speedy trial and compulsory joinder, we focus on the terms of the compulsory-joinder provision in issue here, namely, how the State's "knowledge" is interpreted. Looking at the terms of section 3-3, we are able to conclude that "knowledge" provides a fairly high threshold to trigger compulsory joinder, and case law supports this conclusion. Specifically, the legislature stated that "the several offenses" must be "*known* to the proper prosecuting officer." (Emphasis added.) 720 ILCS 5/3-3(b) (West 2006). We note that the legislature chose "knowledge" as opposed to some other standard, such as probable cause, to define the quantum of information the State must possess to trigger the compulsory-joinder provision. In interpreting a statutory provision, we seek to discern and give effect to the legislature's intent. *People v. Roberts*, 2013 IL App (2d) 110524, ¶ 4. The best indication of the legislature's intent is the language used in the statute, which must be given its plain and ordinary meaning where the statute is unambiguous. *Id.* Here, the statute unambiguously requires that the "several offenses" be "known" to the State at the time the original offense is charged.

¶ 73 Further, the concept of "knowledge" (*i.e.*, that something is known) is well settled and well defined in the criminal law. For example, as a state of mind, "knowing" or "knowledge" means that the actor is consciously aware that his or her conduct is of that nature described by the relevant statute or that those circumstances described by the relevant statute exist. 720 ILCS 5/4-5(a) (West 2006). Similarly, the verb "to know" is pertinently defined as "to apprehend with certitude as true, factual, sure, or valid." Webster's Third New International Dictionary 1252 (1993). Thus, "known" for the purposes of the compulsory-joinder provision means a conscious awareness and certitude concerning relevant facts.

¶ 74 Further illustrating the role of "knowledge" are national prosecutorial standards, which offer tangential support to our view of section 3-3. For example, conceptions of prosecutorial discretion suggest that the prosecutor's knowledge of a fact is based on the level of doubt of the defendant's guilt and the sufficiency or insufficiency of admissible evidence of the defendant's guilt. See National District Attorneys Ass'n, *National Prosecution Standards*, pt. IV (1), (2) (3d ed.); see also ABA Standards for Criminal Justice Standard 3-3.9 (3d ed. 1993). Thus, "knowledge" for purposes of the compulsory-joinder provision is related to the prosecutor's confidence that he or she can secure the defendant's conviction of the crime

charged.

¶ 75     Finally, we observe that the prosecutor's discretion is necessarily brought into issue when evaluating the State's knowledge for purposes of section 3-3. "The State's Attorney is the representative of the People and has the responsibility of evaluating the evidence and other pertinent factors and determining what offense can properly and should properly be charged." *People v. Rhodes*, 38 Ill. 2d 389, 396 (1967). This discretion thus should be considered when evaluating the State's knowledge of the evidence and facts for purposes of determining whether a later charge was subject to compulsory joinder with the original charge.

¶ 76     *People v. Ursery*, 364 Ill. App. 3d 680 (2006), both confirms our view of the proper interpretation of "knowledge" for purposes of section 3-3 and demonstrates how the prosecutor's knowledge is evaluated. In *Ursery*, following the shooting death of the victim, the defendant was arrested and charged with aggravated discharge of a firearm and aggravated unlawful use of a weapon. *Id.* at 684-85. These charges were in part based on the defendant's statement admitting that he fired a gun at the victim in self-defense, but claiming that he fired only two shots, dropped the gun, ran away, and, while fleeing, heard more shots. *Id.* at 684. Other evidence indicated that the shots fired at the victim were all rapid and without a pause after the first two shots. *Id.* at 681-82. In addition, the victim identified the shooter as a particular individual's friend, and the police determined that the defendant fit that description. *Id.* at 684. The defendant was placed into the county jail and, about a month later, the defendant bragged to his cell mate, who happened to be a friend of the victim, that he had used gloves in the deliberate shooting of the victim, so he could not be tied to the crime. *Id.* at 685. About two months after the defendant bragged to his cell mate, the State charged the defendant with murder. *Id.* Following a trial, the defendant was convicted of murder. *Id.*

¶ 77     The defendant appealed and argued that the State failed to timely institute the murder prosecution, violating the compulsory-joinder requirements of section 3-3 of the Criminal Code. The appellate court reasoned that, at the time the defendant was initially charged with the weapons offenses, the State had enough evidence to allow it only to suspect that the defendant intended to kill the victim. At that point, the State was not required to join the murder charge to the weapons charges, because the State only suspected and did not "know," pursuant to the compulsory-joinder provision and given the available evidence, that the defendant intended to kill the victim. *Id.* at 690. It was not until the State learned that the defendant had bragged about killing the victim, and noted that he planned the offense so as not to leave any evidence, that the State had knowledge of the offense of murder for purposes of the compulsory-joinder provision. *Id.* Because the State did not know of the murder (despite some circumstantial evidence that appeared to correlate with the State's theory at the eventual murder trial) for purposes of the statute, the offense was not subject to compulsory joinder with the weapons offenses at the time they were charged, and the murder charge was not prosecuted untimely or in violation of the defendant's speedy-trial rights. *Id.*

¶ 78     Viewing the foregoing together, we conclude that, for purposes of section 3-3, "knowledge" or "known to the proper prosecuting officer" means the conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction. When the State has that awareness necessarily defies universal definition, and thus it must

be determined on a case-by-case basis. Likewise, when the State has only a suspicion of the defendant's involvement in an offense is a similarly fuzzy concept that must also be determined case by case. With these principles in mind, we turn to the parties' contentions.

¶ 79 Defendant argues that the State unquestionably knew about his alleged participation in the Gonzalez shooting. Defendant notes that, shortly after the Gonzalez shooting, the State charged defendant with gun possession and solicitation to commit aggravated discharge of a firearm. At the time these charges were pending, the State had information from a confidential informant, Hector Rodriguez, that defendant had both passed out the weapons and issued the instructions for the Gonzalez shooting. Defendant contends that the State used this theory of defendant's involvement in the Gonzalez shooting as evidence in aggravation for defendant's sentencing for the gun-possession offenses. Additionally, in the 2007 murder prosecution, the State used defendant's admissions of possessing the firearms used in the Gonzalez shooting as evidence to support its theory of defendant passing out the weapons and ordering the shooting. Defendant contends that, as a result, he should have been prosecuted in 1991 for the murder charges that the State actually initiated in 2007. He adds that the State's failure to do so ran afoul of the *Ronald Williams* rule and resulted in the lapse of the speedy-trial period. According to defendant, because the 2007 murder prosecution was untimely, his conviction of that offense cannot stand.

¶ 80 The State counters that it had only a general idea or suspicion concerning defendant's participation in the Gonzalez shooting. The State acknowledges that it knew after the Gonzalez shooting that defendant had received a number of firearms, including the ones used in the shooting. The State also had information from Hector Rodriguez that defendant might have been involved by holding a meeting and passing out the weapons and ordering the Gonzalez shooting to proceed. However, a number of the gang members who testified for the State at defendant's murder trial revealed that, in 1991, they lied to police about various details of the offense. Thus, the testimony that supported the State's theory in the 2007 murder charges and trial was not available to the State in 1991. Additionally, while Hector Rodriguez told police that defendant ran the meeting and passed out the weapons and ordered the Gonzalez shooting to proceed, other gang members had different recollections both at the time of the shooting and at defendant's trial for the murder of Gonzalez. While the State had some information that tended to indicate that defendant had been involved in the Gonzalez shooting, that information was insufficient to prove that defendant had been involved. It was only when more gang members decided to cooperate with the authorities that the State received information that validated its suspicions about defendant's involvement. The State concludes that, as a result, it cannot be determined that, for purposes of section 3-3 of the Criminal Code, the State had the requisite knowledge that would have compelled it to charge defendant with murder at the same time it was prosecuting defendant for gun possession and solicitation to commit aggravated discharge of a firearm.

¶ 81 Both parties provide sound arguments that draw support from the record. For example, defendant's primary contention, that the State used the same theory of the case both as evidence in aggravation for his sentencing on the 1991 gun-possession charges and in the 2007 murder charges, is bolstered by the fact that Hector Rodriguez both provided the police with information in 1991 and testified in the murder trial. Hector Rodriguez both times

-18-

offered evidence that defendant passed out the weapons and instructed the gang to shoot Gonzalez. Likewise, the State's contention, that it had only a suspicion about defendant's involvement in the Gonzalez murder, finds support in the facts that, after 1991, the investigation languished until cooperating witnesses from the gang began to come forward, and those cooperating witnesses admitted during the murder trial that they had lied to the police during the investigation at the time of the offense. That said, we further note that our resolution of the substantive issue here, whether the State had "knowledge" sufficient to require compulsory joinder, hinges on the procedural posture of the contention, raised in defendant's postconviction petition. Therefore, we turn to the standards governing a postconviction petition.

¶ 82       The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a method by which a defendant can assert that his or her conviction resulted from the denial of state or federal constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). To commence proceedings under the Act, the defendant must file a petition in the circuit court in which the underlying trial took place, and the petition must set forth how the defendant's constitutional rights were violated. *Id.* Because most postconviction petitions are filed by defendants with little or no legal training, only a limited amount of detail is required in the first-stage petition, and the threshold for surviving the first stage is low. *Id.* In other words, the defendant need set forth only the gist of a claim of deprivation of constitutional rights, even if the petition does not include formal legal arguments and citations to authority. *Id.*

¶ 83       At the first stage in the postconviction process, the trial court reviews the defendant's petition on its own, without input from the parties. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). During this stage, the trial court may review the court file, transcripts, and any appellate court actions. *Id.* At this stage, the court treats allegations of fact as true so long as those allegations are not affirmatively rebutted by the record. *People v. Bethel*, 2012 IL App (5th) 100330, ¶ 10. The petition will be dismissed if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2010). A postconviction petition is frivolous or patently without merit where it has no arguable basis either in law or in fact. *Hodges*, 234 Ill. 2d at 16. Further, a petition that lacks an arguable basis in either law or fact is one that is based on an indisputably meritless legal theory or fanciful factual allegations. *Id.* An example of an indisputably meritless legal theory is one that is completely contradicted by the record. *Id.* Similarly, fanciful factual allegations include those that are fantastic or delusional. *Brown*, 236 Ill. 2d at 185.

¶ 84       Defendant argues that the trial court erred by looking beyond the allegations of his postconviction petition and overlooking the materials submitted with the petition. This contention, however, fails to acknowledge that the trial court is allowed to look through the record. *Id.* at 184. The State, for its part, argues that consideration of the entire record contradicted defendant's contention that the State was required to join the murder charges to the gun-possession and solicitation-to-commit-aggravated-discharge-of-a-firearm charges because the State had sufficient knowledge of the facts at the time of the initial investigation into Gonzalez's murder. Effectively, then, the State argues that, because the record completely contradicts defendant's allegations in his postconviction petition, defendant's legal theory is indisputably meritless. We disagree.

¶ 85     We note that, at the first-stage, a postconviction petition's allegations are to be liberally construed and taken as true. *People v. Hommerson*, 2013 IL App (2d) 110805, ¶ 7. In addition, the court may not engage in fact finding. *Id.* Further, while the record contains information contrary to defendant's theory of the case, it also contains information supporting it. In other words, considering the petition and the record together demonstrates the existence of a factual issue. Because the court cannot engage in factual determination in the first stage (*id.*), it is appropriate to pass to the second stage. Stated another way, the record does not completely contradict the allegations of the petition, so we cannot say that defendant's legal theory of the case is indisputably meritless. See *Hodges*, 234 Ill. 2d at 16.

¶ 86     Finally, when boiled down, defendant is asking what the State knew and when the State knew it. The answers to these questions require factual determination, which is precisely what should not be done during the first stage of postconviction review. *Hommerson*, 2013 IL App (2d) 110805, ¶ 7. Thus, we hold that the trial court erred in dismissing defendant's postconviction petition in the first stage of its review. We further emphasize that, despite our holding, we express no opinion as to the actual merits of defendant's petition, only that it should be advanced to the second stage of postconviction review.

¶ 87     Defendant also alleged that his attorneys offered him constitutionally ineffective representation. We cannot provide a determination on this issue at this time. We have found a factual issue regarding the substantive issue of whether the State had the necessary knowledge to prosecute defendant for Gonzalez's murder in 1991. This determination will drive the result on the ineffectiveness claim: if the State had sufficient knowledge, then a motion to dismiss should have been filed and likely would have succeeded, leading to the conclusion that defendant's counsel was ineffective (see *People v. Boyd*, 363 Ill. App. 3d 1027, 1036 (2006) (in that case, there was "no dispute that the prosecutor knew of the facts underlying the home invasion counts on the date [the] defendant was arrested on the original charges and that the additional charges arose from the same facts as the original charges")); on the other hand, if the State did not have sufficient knowledge until gang members began to cooperate with the authorities, then a motion to dismiss would not have been successful, leading to the conclusion that defendant's counsel was not ineffective, because there could not have been any prejudice to defendant. See *People v. Williams*, 2012 IL App (1st) 100126, ¶ 26 (to prevail on a claim of ineffective assistance, a defendant must show objectively deficient representation and prejudice arising from the deficient representation; and the court may dispose of the claim if the defendant is unable to demonstrate that either requirement has been satisfied). Thus, we need not consider defendant's arguments further. We therefore reverse the trial court's ruling on defendant's postconviction petition and remand the cause for further proceedings consistent with our opinion here.

¶ 88                                    III. CONCLUSION

¶ 89     For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, defendant's sentence is vacated, and the cause is remanded with directions.

¶ 90     Judgment reversed and sentence vacated; cause remanded with directions.